**Louis WOLFISH et al.,
Petitioners-Appellees,**

v.

**Honorable Edward LEVI et al.,
Respondents-Appellants.**

**Nos. 618 and 623, Dockets 77-2035
and 77-2135.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 6, 1978.

Decided Jan. 24, 1978.

---

Louis G. Corsi, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, Frederick P. Schaffer, Asst. U. S. Atty., New York City, of counsel), for respondents-appellants.

Phyllis Skloot Bamberger, New York City (Michael B. Mushlin, William E. Hellerstein, Nancy Lee and David Lewis, the Legal Aid Society Federal Defender Services Unit, New York City, of counsel), for petitioners-appellees.

Before KAUFMAN, Chief Judge, TIMBERS and MESKILL, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

When the history of our criminal justice system is chronicled, no doubt one of its most sobering pages will describe the sad state of this nation's prisons and jails. Whether it be in filthy, narrow cells of an Alabama penitentiary or in overcrowded dormitories in a Bronx house of detention, we have quartered individuals, both convicted or merely accused of crimes, major and minor, under conditions that shock the conscience of civilized men. To redress these glaring deficiencies, courts have often been summoned to insure that, at the least, minimum standards of human decency are met. And, when inhuman or barbaric conditions, or in the case of pretrial detainees, substantial deprivations not compelled by administrative necessity, are discovered, judges should not hesitate to enter the breach.

But, courts are singularly ill-suited to administer the minutiae of the daily affairs of prisons. Accordingly, although district courts are empowered with broad discretion to frame equitable remedies so long as the relief granted is commensurate with the scope of the constitutional infraction, a trial judge must tread carefully in less substantial matters best left to the expertise of prison officials.

This sprawling appeal, raising a score of issues concerning conditions and practices at New York's Metropolitan Correctional Center ("MCC"), presents this dilemma in sharp relief. In his decree, Judge Frankel intervened broadly into almost every facet of the institution. In most instances, the able district court judge's incursion on administrative authority was well-founded, and cured serious constitutional deficiencies in the operation of the MCC. But in other cases we believe a balance more restrained should have been struck between the court's power to redress inmate grievances and deference to prison administrators. Many of the cited deficiencies, if indeed they existed, were not of a kind to require a chancellor's decree to bring about compliance.

Of course, the problems presented by such an over-expansive decree do not fall on the trial judge's shoulders alone. In too many cases, the parties' impulse is to run to the courts as a first resort, no matter how minor or trivial the problem. The fault in this respect lies too often with unresponsive or uncooperative government officials. And as then Chief Judge Friendly aptly stated in *Negron v. Wallace*,[1] "there is . . . a responsibility, resting upon all counsel but especially upon those for civil rights organizations, not to swell the tidal wave of actions under the civil rights statute by bringing suits for . . . relief when no need for this exists."[2] After wading through the many aspects of this decree, we can only implore the litigants in this case to avoid this increasingly acute problem of "litigation neurosis"[3] in future disputes by resolving petty problems in the administrative arena, without burdening our courts.

### I.

In August 1975, when the Metropolitan Correctional Center replaced the converted waterfront garage on West Street that had served as New York City's federal jail for over 45 years, it represented the architectural embodiment of the best and most progressive penological planning. Abjuring the cage motif of traditional cellblock jail construction, the architects of the MCC, the New York firm of Gruzen and Partners, well-known for its innovative work in correctional design, created a series of self-contained "modular units". Each unit consisted of approximately 24 private rooms, or six dormitory rooms, adjacent to a multi-purpose room, a balcony education area and a recreation room to which inmates were to, and in fact do, have access for 16 to 19 hours a day.

In the view of Paul Silver, Gruzen's principal architect on the MCC project, as well as the numerous other correctional experts who assisted in the jail's development,[4] the modular unit concept was a sensible alternative to the "illusory freedom" of the standard jail. By substantially eliminating the need for inmate movement to major facilities within the institution, the corresponding necessity of locking inmates in their cells while the staff directed traffic was reduced and face-to-face contact between inmates and their keepers increased. The modular unit, in short, was expected to humanize staff-inmate relations and pro-

---

1. 436 F.2d 1139 (2d Cir. 1971).

2. *Id.* at 1141.

3. See Kaufman, 39 Brooklyn L.Rev. xiii, xiv-xv (1973). The famous satirical writer Russell Baker commented in a recent *New York Times* article that immediate resort to the courts to solve every problem, no matter how insignificant, has become "a new national habit." He cogently observes, "[t]he courthouse solution is not only expensive, troublesome to the [litigant] and time consuming, but also debilitating to [his] self-esteem, for it reminds [him] that to cope with the problem which [his parents] could solve in an afternoon, [he] requires the aid of lawyers, a judge, a jury, witnesses, tran-

scripts, three years of litigation and two appeals courts." Baker, "The Courts of First Resort," *N.Y. Times,* July 26, 1977, at 29, col. 1. Of course, we do not intimate any view as to the merits of the lawsuit, now pending in the District of Connecticut, on which Mr. Baker bases his article.

4. Among those experts were several witnesses in this case, including: Norman Carlson, Director of the Bureau of Prisons; Gary Mote, Assistant Director of Planning and Development for the Bureau; Dr. Walker W. Menninger; and, William G. Nagel.

vide a more "homelike" atmosphere, affording inmates greater privacy and freedom than jails of earlier construction.

The modular unit concept was fully implemented in the design of MCC. Each of the ten residential units is furnished with recreational and exercise equipment, telephones, color televisions, books, food preparation and dining facilities, and a visiting room. The residential atmosphere is enhanced by carpeting and the exterior walls are studded with clear plastic windows. There are no central dining, recreational, religious, assembly or work facilities with the exception of an outdoor recreation area on the roof.

When this action was commenced, the law library, general library and commissary were all essentially storerooms from which books and other items could be ordered. In fact, most inmates, except a selected cadre of sentenced inmates, may leave their unit only for one hour of daily recreation on the roof, if the weather permits, and for sick calls and court appearances.

But, Samuel Johnson's comment, "Hell is paved with good intentions,"[5] is particularly appropriate here. While the MCC in operation can by no means be characterized as an earthly Hades, it nevertheless has fallen far short of its planners' expectations. Their major miscalculation has proven to be a failure to foresee the influx of more inmates than contemplated. Although originally designed to accommodate a population 50 percent larger than the 300 inmate capacity of the West Street jail, an unprecedented rise in pretrial and sentenced commitments commencing in 1975 quickly forced the MCC to house numbers significantly in excess of its rated capacity. To satisfy these demands, the MCC's administrators have pressed into service every square foot of space which conceivably could be used as sleeping space. The dele-

terious effects of this overcrowding will be described in greater detail. Suffice it to say that overcrowding has destroyed any modicum of privacy for many pretrial detainees. They find themselves double-bunked in rooms designed for and, according to Silver, capable of holding only one. We find even more disturbing however, the fact that when no rooms are available, as is customarily the case, new arrivals are forced to sleep on sofas or cots in the common areas under the glare of constantly burning lights. And sentenced inmates have been crammed 20 at a time into dormitories intended to house only ten. Moreover, the stresses of serious excess population have burdened beyond capacity equipment and other facilities designed for far fewer people.

II.

The consequences of this excessive crowding, strained by frustrations over the physical curbs resulting from modular confinement and the restrictions and degradation that are common generally to prisoners, led to the institution of this suit. Indeed, this lawsuit mirrors the difficulties present at the MCC almost from its inception, for it was commenced barely four months after the institution opened. On November 28, 1975, inmate Louis Wolfish, proceeding *pro se,* sought a writ of habeas corpus because of allegedly unconstitutional conditions at the facility. A week later, on December 2, 1975, the action was declared a class action on behalf of all persons confined at the facility, including pretrial detainees and sentenced prisoners,[6] and the Legal Aid Society was assigned as counsel. On January 11, 1976, the Society filed an amended petition, charging that inmates had been deprived of their constitutional and statutory rights because of, *inter alia,* overcrowded conditions, lengthy confinements, unnecessary restrictions on movement, inadequate

5. Boswell, *Life of Johnson,* April 14, 1775.

6. In addition to pretrial detainees—that is unconvicted individuals awaiting trial, held at the MCC because they could not post bail—the MCC holds sentenced prisoners awaiting assignment to another prison facility or who have

been designated to serve their terms at the MCC, sentenced prisoners transferred to the MCC on writs to testify or stand trial, witnesses in protective custody, and persons incarcerated for contempt of court.

visiting hours, and lack of sufficient employment, recreational and educational opportunities. This litany of woes touched on almost all aspects of the institution's conditions and practices.[7]

In the year following the filing of the amended petition, Judge Frankel intervened twice to correct alleged maladministration of the facility. On January 28, 1976, after notices at the MCC heralded a severe curtailment of visiting hours, he issued a preliminary injunction to maintain the status quo pending the outcome of the litigation. And on October 1, 1976, after the New York Telephone Company threatened to remove the MCC's telephones because of a multitude of fraudulently placed calls, a second preliminary injunction was issued ordering the facility to maintain and improve its system of local and long distance telephone services.

### III.

Upon appellees' motion, and appellants' cross-motion, for partial summary judgment, a variety of other issues were decided on January 5, 1977. Relying on affidavits "recounting undisputed facts" and upon his own observations in touring the facility, Judge Frankel enjoined the use of single occupancy rooms for two inmates ("double-celling"), confiscation of property without supplying receipts, reading of outgoing mail, and enforcement of a "publisher only"

rule that limits inmates to the receipt of reading materials directly from a publisher or book club. On the other hand, Judge Frankel upheld the appellants' practice of opening legal mail in the presence of the recipient for the exclusive purpose of discovering contraband. Judge Frankel also ruled that "non-legal" mail could be opened and searched for contraband without probable cause and in the inmate's presence, but that the contents could be read only in front of the inmate on a showing of probable cause. Rulings on other complaints, including a severe limitation on the receipt of packages, were deferred. *See United States ex rel. Wolfish v. United States*, 428 F.Supp. 333 (S.D.N.Y.1977). Appellants filed a notice of appeal from this order on March 18, 1977.

### IV.

Finally, trial of the many remaining issues began on February 28, 1977 and continued until the end of the following month. At trial, appellees called 21 witnesses, relying primarily on the testimony of MCC inmates and four correctional experts; appellants, in turn, summoned 23 witnesses to the stand, including MCC personnel and a battery of seven correctional experts.[8] In addition to hearing this testimony and receiving numerous exhibits into evidence, Judge Frankel, in his customary conscientious manner, twice toured the MCC during trial.

---

7. As an indication of the scope of this action, the amended petition also decried the inadequate phone service; "strip" searches; room searches outside the inmate's presence; a prohibition against the receipt of packages or the use of personal typewriters; interference with, and monitoring of, personal mail; inadequate and arbitrary disciplinary and grievance procedures; inadequate classification of prisoners; improper treatment of non-English speaking inmates; unsanitary conditions; poor ventilation; inadequate and unsanitary food; the denial of furloughs; unannounced transfers; improper restrictions on religious freedom; and an insufficient and inadequately trained staff.

8. Of the 21 witnesses called by the appellees, ten were inmates or former inmates of the MCC who had been incarcerated in virtually every area of the prison for appreciable lengths of time. In addition, appellees presented the

testimony of the following correctional experts: Dr. Frank N. Rundle, supervising psychiatrist with the Lower East Side Service Center in New York City; William G. Nagel, Director of the Institute of Corrections of the American Foundation; Dr. David Fogel; and, Henry Alter.

Of the 23 witnesses called by the appellants, 14 were employees of the MCC. They also utilized seven expert witnesses, four of whom were employees of the Federal Bureau of Prisons. These experts included Gary Mote, Associate Director of Planning and Development for the Bureau; Norman Carlson, Director of the Bureau, and Dr. William Walter Menninger. The roster of expert witnesses on both sides of this litigation is familiar to all who have followed the history of cases in this Circuit involving the conditions of pretrial detention.

On September 15, 1977, the judge decided all the remaining issues except those related to the adequacy of medical care.[9] He granted relief on the issues concerned with classification and movement between modules, overcrowding, law library facilities, the commissary, receipt of packages, use of personal typewriters, social and attorney visitation, telephone service, inmate presence during room searches, "strip" searches, uniforms, the availability of exercise for those inmates held in administrative detention, special diets for Muslim inmates, inspection of "incoming mail", and women's "lock-in". Other claims, touching on food, staff, and transfers, were dismissed. *See United States ex rel. Wolfish v. Levi,* 439 F.Supp. 114 (S.D.N.Y.1977). On October 21, 1977, appellants filed a notice of appeal from this judgment.[10]

## V.

### *Constitutional Standards*

#### 1. *Pretrial Detainees*

■ Fundamental to the Anglo-American jurisprudence of criminal law is the premise that an individual is to be treated as innocent until proven guilty by a jury of his or her peers. We have demonstrated our belief in this basic principle by according to pretrial detainees the rights afforded unincarcerated individuals, including, *inter alia,* rights to free speech, *Wilkinson v. Skinner,* 462 F.2d 670 (2d Cir. 1972), and freedom of religion, *Kahane v. Carlson,* 527 F.2d 492 (2d Cir. 1975). Accordingly, it is not enough that the conditions of incarceration for individuals awaiting trial merely comport with contemporary standards of decency prescribed by the cruel and unusual punishment clause of the eighth amendment. Time and again, we have stated without equivocation the indisputable rudiments of due process: pretrial detainees may be subjected to only those "restrictions and privations" which "inhere in their confinement itself or which are justified by compelling necessities of jail administration." *Rhem v. Malcolm,* 507 F.2d 333, 336 (2d Cir. 1974) (*"Rhem I"*); *Rhem v. Malcolm,* 527 F.2d 1041 (2d Cir. 1975) (*"Rhem II"*); *Detainees of Brooklyn House of Detention for Men v. Malcolm,* 520 F.2d 392 (2d Cir. 1975) (*"Detainees"*). This standard of compelling necessity is neither rhetoric nor dicta. And we have made it clear that deprivation of the rights of detainees cannot be justified by the cries of fiscal necessity, *Todaro v. Ward,* 565 F.2d 48, at 54, n. 8 (2d Cir. 1977), administrative convenience, *Estelle v. Williams,* 425 U.S. 501, 505, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), or by the cold comfort that conditions in other jails are worse, *Rhem I,* 507 F.2d at 338. *See generally* Note, *Constitutional Limitations on the Conditions of Pretrial Detention,* 79 Yale L.J. 941 (1970).

But, we cannot ignore the Supreme Court's admonition in *Procunier v. Martinez,* 416 U.S. 396, at 405, 94 S.Ct. 1800, at 1807, 40 L.Ed.2d 224 (1974):

> . . . . courts are ill-equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism.

*See also Newman v. State of Alabama,* 559 F.2d 283, 286–87 (5th Cir. 1977).

Accordingly, once it has been determined that the mere fact of confinement of the detainee justifies the restrictions, the institution must be permitted to use reasonable means to insure that its legitimate interests in security are safeguarded. We may disagree with the choice of means, but it is not wise for us to second-guess the expert administrators on matters on which they are better informed. *See Jones v. North Caro-*

---

**9.** The medical issues are presently being tried before the Hon. Sol Schreiber, U.S. Magistrate, who is sitting as a special master pursuant to Judge Frankel's order dated August 30, 1977.

**10.** Subsequently, on November 15, 1977, we granted the appellants' request for a stay of portions of the judgment. At the same time, because of the importance of the issues raised by the case, we expedited the hearing of this appeal, and consolidated the appeal from the previous summary judgment order with the appeal from the final judgment of October 13, 1977.

*lina Prisoners' Labor Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). Concern with minutiae of prison administration can only distract the court from detached consideration of the one overriding question presented to it: does the practice or condition violate the Constitution?

### 2. Sentenced Inmates

■ The parameters of judicial intervention into the conditions of incarceration for sentenced prisoners are more restrictive than in the case of pretrial detainees. An institution's obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety. The Constitution does not require that sentenced prisoners be provided with every amenity which one might find desirable. *Newman v. State of Alabama, supra,* 559 F.2d at 291.

### VI.

*Statutory Jurisdiction*

■ Although the judgment in this case is in substantial part grounded on uncontrovertible constitutional principles, it seems to wander on occasions into administrative matters that can only be described as trivia. It appears the trial court justified a number of these intrusions solely on its assertion of a federal judge's statutory jurisdiction to oversee the operation of federal jails and prisons and not on any constitutional infringements.

While it is true that the Administrative Procedure Act permits a federal court to set aside federal agency action found to be "arbitrary" or "capricious", in violation of a statute, or of the Constitution,[11] there is substantial disagreement whether the Act applies to federal prisons. *Compare Clardy*

*v. Levi,* 545 F.2d 1241 (9th Cir. 1976) *with Ramer v. Saxbe,* 173 U.S.App.D.C. 83, 522 F.2d 695 (1975). We find it unnecessary to decide whether the Act would apply if the breach of a specific statutory mandate by federal prison officials were established, however, for the Act specifically exempts entirely from judicial review "agency action [which is] committed to agency discretion by law."[12] *See Greater New York Hospital Ass'n v. Mathews,* 536 F.2d 494 (2d Cir. 1976). The enabling statutes relied upon by appellees vest this broad unreviewable discretion in the Attorney General, merely requiring him to provide "suitable" quarters, safekeeping, care and subsistence for all inmates in his custody.[13] Accordingly, we cannot find any basis for the invocation of statutory jurisdiction in this case.[14]

The wisdom of the Act's exemption of matters committed to agency discretion is only too vividly illustrated by the judgment in this case, for, unfortunately, the price of reaching to cure petty inconveniences, although motivated by the most humane instincts, is to fail to reserve the judge's awesome power and authority for matters of substance, not to be diminished by triflings. A striking example is the section of the decree abolishing the MCC's policy requiring visitors to request the key to the visiting room bathroom from a correctional officer. Although we understand that the order emanates from the court's understandably frustrating attempt to cope with the MCC's policy on social visits, which at one time forced visitors to return to the lobby and endure a lengthy reprocessing procedure whenever they wished to use restroom facilities, such a direction, prohibiting a practice commonly employed by service stations, or corridor restrooms of major corporations, could be better dealt with by

11. *See* 5 U.S.C. § 706 (1976).

12. *See* 5 U.S.C. § 701(a)(2) (1976).

13. *See* 18 U.S.C. § 4042 (1970). *See also* 18 U.S.C. § 4081 (1970).

14. In contrast, *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), relied on by appellees, involved the violation by the Secretary of Transportation of a specific statutory mandate requiring him not to approve construction of a road through a park unless no feasible alternative existed.

methods other than inclusion in a judgment of a federal district court.[15]

■ It would have been advisable also for the trial court not to become embroiled in the emotion-laden controversy between the parties over the provision of telephone services. When this litigation commenced, the MCC provided 23 pay telephones for local calls. But in September 1976, appellants advised counsel for the appellees that the number of telephones available for inmate use would be cut in half due to massive losses incurred by the New York Telephone Company as a result of fraudulently made telephone calls. On October 1, 1976, the trial court preliminarily enjoined the reduction, and mandated the installation of 23 telephones for long distance calls. The terms of this injunction are embodied in the final judgment.

Although pretrial detainees enjoy a first amendment right to communicate by telephone with persons outside the prison, that right has never been construed to mandate a special level of telephone service. *See, e. g., Dillard v. Pitchess,* 399 F.Supp. 1225, 1240 (C.D.Cal.1975). Accordingly, to require the MCC to return to court whenever it seeks to make any change, however minor, in its telephone service, would place great strains on overburdened federal judges and would, in essence, preempt the role of prison officials.[16] Disputes of a kind just illustrated would best be handled by the inmate grievance procedure provided by the Bureau of Prisons, rather than federal courts.[17]

## VII.

*Overcrowding*

### a. *Double-celling*

■ Of the 389 rooms in the MCC designed for single occupancy, 121 were double-celled when Judge Frankel banned the practice in January 1977. Since the administrators of the MCC have made no showing of compelling necessity to justify the substantial abrogation of personal privacy imposed by double-celling, we affirm as to pretrial detainees. We remand for reconsideration the prohibition on double-celling of sentenced inmates for reasons we shall set forth.

In *Detainees of Brooklyn House of Detention for Men v. Malcolm,* 520 F.2d 392 (2d Cir. 1975), we found the confinement of two pretrial detainees in a single forty square foot cell in the Brooklyn and Queens houses of detention so "dehumanizing as to constitute an additional hardship beyond the need for custody in violation of the detainees' due process and equal protection rights." 520 F.2d at 397. The infringements on privacy and personal dignity which underlay that decision are also present here.

Visual inspection of the rooms, coupled with the testimony of architect Paul Silver that double-celling was a "clear violation of the capability" of the MCC's individual rooms, led Judge Frankel to conclude that their basic structure mandated use by a single occupant. Indeed, the average room affords two inmates virtually no space for minimal privacy or in which to avoid the other's presence. Inmate testimony in *De-*

---

**15.** See *Negron v. Wallace,* 436 F.2d 1139 (2d Cir. 1971).

**16.** For the same reason we must reverse the district court's order requiring the MCC to maintain precisely unchanged its present schedule for social visits. Pretrial detainees certainly have a first amendment to contact visits. *See, e. g., Miller v. Carson,* 563 F.2d 741, 748 (5th Cir. 1977). Moreover, visits should be as long as administrative manageability allows. *See Gilmore v. Lynch,* 319 F.Supp. 105 (N.D.Cal.1970), *aff'd,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971). But to

require appellants to return to court whenever they seek to make even minor adjustments in the visiting hours constitutes an undue burden on the court and the administration.

We also strike the portion of the order, founded solely on an assertion of statutory jurisdiction, which requires the MCC to take commissary requests every other day rather than once a week. See also, our discussion of attire, *infra,* pp. 1222–1223.

**17.** See Department of Justice, Bureau of Prisons Policy Statement No. 2001.6A (October 16, 1974).

*tainees* revealed that double-celling had produced numerous disagreements over the choice of activities within the room, and had spawned fights, charges of theft, and frequent involuntary physical contact as the two inmates passed each other in the narrow aisle of walking space.[18] Moreover, double-celling substantially taxed common area facilities. Judge Frankel found, for example, that insufficient dining accommodations had created "more pressure to eat in the cell, with its single chair, open toilet and unselected companion." [19]

Appellants argue that the average room at the MCC is nearly twice as large—75 square feet—as the cells involved in *Detainees,* and that other conditions at MCC are more pleasant. But we find the lack of privacy inherent in double-celling in rooms intended for one individual a far more compelling consideration than a comparison of square footage or the substitution of doors for bars, carpet for concrete, or windows for walls. The government has simply failed to show any substantial justification for double-celling. In fact, since Judge Frankel's order in January 1977, the MCC has eliminated double-celling merely by reducing its permanent work "cadre" of convicted inmates designated to serve their sentences at MCC from 103 to 21. Although this diminution of the "cadre" has made the operation of MCC somewhat more difficult, administrative inconvenience can never excuse the deprivation of the constitutional rights of pretrial detainees. *Cf. Estelle v. Williams,* 425 U.S. 501, 505, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). Indeed, the reduction of the "cadre" has had the beneficial effect of opening more work opportunities to idle pretrial detainees and writ prisoners.

The trial court also banned double-celling of sentenced inmates on the ground that to quarter "an inferior minority of persons . . . in ways found unconstitutional for the rest" would constitute cruel and unusual punishment. *See* 428 F.Supp. at 339. This, of course, ignores our insistence that different and higher constitutional standards must be applied to pretrial detainees than to sentenced prisoners. As we noted earlier, appellants, owe the convicted population merely the duty of providing adequate housing. We expect that on remand the trial court may well find that double-celling in a 75 square foot room violates the eighth amendment. Such an arrangement allows each prisoner only 38 square feet of space in the individual room, well below accepted standards recommending the provision of 50 to 75 square feet of room space per inmate.[20] But, it appears that the "cadre" of sentenced inmates is housed in the Honor Unit, which contains rooms ranging in size from 100 to 150 square feet. We cannot say on the record before us that placing two sentenced inmates in rooms so spacious constitutes a *per se* violation of the eighth amendment.

b. *Balconies*

■ An average of 27 or 28 newly-arrived inmates sleep in the common areas of the MCC every night. At trial, individual inmates testified that stays in the common areas often stretch to a week or more. Since cots and personal belongings are inaccessible during the day, the balconied in-

---

**18.** Similarly, we found in *Detainees* that the confinement of two pretrial detainees together not only deprives each of his privacy but also increases tension and aggressive tendencies. *See* 520 F.2d at 396.

**19.** 428 F.Supp. at 337.

**20.** See note 22, *infra,* and the accompanying text. We note also that the Commission on Accreditation for Corrections of the American Correctional Association has recommended that individual cells have a floor area of at least 60 square feet. *See* Commission on Accreditation for Corrections, *Manual of Standards for*

*Adult Correctional Institutions,* Standard 4142 (August 1977). And in *Ambrose v. Malcolm,* 414 F.Supp. 485, 492 (S.D.N.Y.1976), Judge Lasker noted that the National Sheriffs' Association's *Handbook on Jail Architecture* (1975), 62–63, recommends that single occupancy rooms should average 70 to 80 square feet. *But see Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676, 690 (D.Mass.1973), aff'd, 494 F.2d 1196 (1st Cir.), *cert. denied sub nom. Hall v. Inmates of Suffolk County Jail,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974).

mate is accorded, as Judge Frankel found, "literally zero square feet" of personal living space. Such an inmate has no means of securing any degree of privacy. Moreover, sleeping is difficult because the balcony lights burn all night. Since appellants have offered no explanation for this completely inadequate housing except administrative convenience, we affirm Judge Frankel's prohibition of the practice. *See Todaro v. Ward, supra,* 565 F.2d at 54, n. 8.

### c. *Dormitories*

■ The dormitory unit, originally intended to hold ten inmates in each of its six rooms, now houses 120 sentenced inmates. As a result, the district court found, the situation within the dormitory unit "is one of intolerable crowding, strain, and distortion of facilities." 439 F.Supp. at 136. He ordered that a maximum of 60 inmates be housed in the dormitory unit.

While concurring in Judge Frankel's assessment that operation of the dormitory unit at 200 percent of "rated capacity", even when it is used solely for sentenced inmates, is unacceptable, we find unwarranted his refusal to consider whether any number of inmates in excess of rated capacity could be suitably quartered within the dormitories. There is no constitutional magic to the term "rated capacity". Indeed, "[t]hose who design prisons are not vested with either the duty or the power to prescribe constitutional standards as to prison space." *Newman v. Alabama, supra,* 559 F.2d at 288.

Rather than clinging to the term "rated capacity" as the constitutional standard, we prefer to adopt Judge Lasker's approach in *Ambrose v. Malcolm,* 414 F.Supp. 485 (S.D. N.Y.1976), where he limited to 29 the number of pretrial detainees who could be confined for 23 hours a day in a cell-block consisting of a corridor, a small day room, and a dormitory "rated" for 24 inmates. The figure was derived from the American Correctional Association's standard providing that each inmate should be allowed a total of 75 square feet of living space.[21] To meet the needs of sentenced inmates, the Fifth Circuit, in *Williams v. Edwards,* 547 F.2d 1206, 1215 (5th Cir. 1977), has found 50 square feet of sleeping space adequate. *See also Newman v. Alabama, supra,* 559 F.2d at 288.[22] In fact, if 15[23] sentenced inmates were housed in each MCC dormitory, every inmate would be allotted 58 square feet of space in the dormitory room and 32 additional square feet in the common area. We therefore remand to the district court for reconsideration of this issue.

### *Physical Constraints of Modular Confinement*

■ As we noted above, except for the "cadre", the inmates of the MCC are permitted to leave their units only to go to the roof recreation area, sick call, or to court. This lack of movement severely limits inmate opportunities to attend religious services and educational and recreational programs which are normally given in only a few of the units. Expert testimony at the trial demonstrated that such restricted con-

---

**21.** *See* 414 F.Supp. at 489, 493.

**22.** This standard compares favorably with the National Sheriffs' Association's *Manual on Jail Administration* (1970) at 39, which suggests 55 square feet of space per bed in a dormitory, as well as the recommendation of the National Council on Crime and Delinquency Model Act for the Protection of Rights of Prisoners (1972) (§ 1b) that not less than 50 square feet of floor space be provided in the sleeping area, and with Army guidelines providing 55 square feet of sleeping space per prisoner. *See* 414 F.Supp. at 492–93. The American Correctional Association's Commission on Accreditation for Corrections has recommended that a minimum

of 60 square feet be accorded each inmate housed in a dormitory unit. See Commission on Accreditation for Corrections, *Manual of Standards for Adult Correctional Institutions,* Standard 4144 (August 1977).

**23.** We select 15 inmates as an example because Paul Silver testified that one set of "commonly accepted" criteria in prison design is the provision of one urinal, one toilet and one shower for 15 inmates. *See* Deposition of Paul Silver at 54. Thus, it appears that sufficient sanitation facilities may exist in the dormitories to support up to 15 inmates.

finement over lengthy periods of time could have adverse psychological effects on some inmates. But, although appellants' own witnesses conceded that not all inmates at the MCC require the close custody inherent in strict confinement in the modular unit and that classification would permit freer circulation within the institution, no classification procedure, beyond the largely successful attempt to separate pretrial detainees from sentenced prisoners, exists at the MCC. The district court judge properly ordered appellants to create additional classification guidelines to permit greater movement within the institution.[24]

Judge Frankel also decreed that no inmate may be held without consent at the MCC for more than 60 days. We find the 60-day limitation somewhat arbitrary. We agree that excessively long stays in the MCC may constitute a denial of due process. But, Judge Frankel's opinion supplies no factual basis for the selection of this particular demarcation point. And, since the statistical evidence in this case indicates that over 90 percent of unsentenced inmates are released within three months,[25] we are not persuaded that confinement in excess of 60 days transforms the MCC into a "long-term prison", as the trial court described it, except in several unusual cases.

But, even if the 60-day limitation was warranted under the conditions existing at the time of trial, Judge Frankel has now ordered the appellants to promulgate new classification standards to allow greater movement within the institution. If sufficiently liberal, the new guidelines may considerably ameliorate those very restrictive aspects of modular confinement which necessitated the imposition of the 60-day restriction. Accordingly, we direct appellants to prepare new classification standards within thirty days of this decision, and re-

mand for reconsideration of the 60-day rule in light of those standards.

Finally, since the sole constitutional underpinning for the 60-day requirement was "due process", and there was no finding that longer confinement constituted cruel and unusual punishment, the time limitation should not have been applied to sentenced inmates, and should not be so applied if the trial court chooses to impose a similar time restriction on remand unless he finds that the longer confinement violates the eighth amendment.

### Freedom of Speech and Communication

In the close and restrictive atmosphere of a prison, first amendment guarantees taken for granted in society at large assume far greater significance. The simple opportunity to read a book or write a letter, whether it expresses political views or absent affections, supplies a vital link between the inmate and the outside world, and nourishes the prisoner's mind despite the blankness and bleakness of his environment. Accordingly, courts have jealously protected the inmate in his exercise of first amendment prerogatives. *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Sostre v. McGinnis*, 442 F.2d 178, 199 (2d Cir. 1971) *(en banc), cert. denied sub nom. Oswald v. Sostre*, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972). Two of the MCC's policies, the "publisher only" rule and the reading of out-going nonprivileged mail, significantly intrude upon this protected realm.

■ Pursuant to a policy of the Bureau of Prisons, the MCC permits inmates to receive books and other publications from outside the institution only if the item comes directly from the publisher or a book

---

24. We reject appellants' protest that classification of pretrial detainees is impossible for the reasons stated in *Rhem I*, 507 F.2d at 338.

25. Unfortunately, the statistics used by both the appellants and appellees in their briefs concern the length of stay of *all* inmates, sentenced and unsentenced. Analysis of the corrected affidavit of Marshall Haines, dated June 13,

1977, reveals that over half of the unsentenced detainees held in the MCC prior to trial during the period August 2, 1975 to August 13, 1976 spent ten days or less in the MCC. Three-quarters were released within a month, and more than 85 percent were released within 60 days, although one pretrial detainee was incarcerated for more than a year.

club. Ostensibly, the practice is justified by substantial security problems, giving rise to administrative difficulties in processing reading materials received from all sources. Judge Frankel noted that the MCC could adequately protect its legitimate interests merely by inspecting books and magazines for contraband. He observed, further, that other institutions have not recorded untoward experiences with far less restrictive rules.

The "publisher only" rule severely and impermissibly restricts the reading material available to inmates. We agree with those courts which have struck down such limitations as inconsistent with both the first amendment and due process. *See, e. g., Cruz v. Hauck,* 515 F.2d 322, 333 (5th Cir. 1975) ("publisher only" rule invalidated as to receipt of legal periodicals); *Rhem v. Malcolm,* 371 F.Supp. 594 (S.D.N.Y.1974).[26] While it is true that the MCC's library collection mitigates some of the harshness of the rule, it is obvious that many books sought by inmates are available neither in the library nor directly from a publisher. And it is inconceivable that the first amendment rights of an incarcerated individual do not extend beyond a few, selected titles. *Benjamin v. Malcolm,* 75 Civ. 3073 (S.D.N.Y. November 18, 1975).

 MCC personnel also randomly and routinely read out-going, nonprivileged mail. The institution's administrators rationalize this inspection as a proper method of monitoring escape plans or other threats to security. Judge Frankel concluded that since social visits and telephone calls are not monitored, the mail security justification

was meaningless. He ordered the facility to refrain from reading inmate correspondence absent good cause.

The postal carrier may not be turned back at the jailhouse gate. The right to receive and send mail is unquestionably protected by the first amendment. *Blount v. Rizzi,* 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971). *See also* Sigler, *Freedom of the Mails: A Developing Right,* 54 Geo.L.J. 30 (1965). The Fifth Circuit, in *Taylor v. Sterrett,* 532 F.2d 462, 481 (1976), recently observed:

> [c]orrespondence is a principal method available to prisoners to communicate with private and public individuals or entities. . . . Jail practices which inhibit this medium therefore create a serious impediment to a prisoner's communicative capability.

Indeed, in *Procunier v. Martinez, supra,* the Supreme Court acknowledged an inmate's interest in utilizing this basic medium when it struck down prison regulations permitting broad censorship of prison correspondence.

It cannot be gainsaid that the reading of mail by jail officials chills the expression of first amendment rights by correspondents inside and outside the institution. It takes little more than common sense to realize that a tender note, so important to the morale of the incarcerated individual, might never be penned if the writer knew that it would first be scrutinized by a guard.[27] And, certainly, where social visits and telephone calls are left unmonitored, a spurious

---

**26.** Appellants urge that we follow the reasoning of *Woods v. Daggett,* 541 F.2d 237 (10th Cir. 1976) to reach a contrary result. While *Woods* upheld a "publisher only" rule, it made clear it was doing so within the limited context before it:

> . . . Nevertheless, while the constitutional claim is not wholly insubstantial, when we consider the circumstances of the maximum security institution the size of Leavenworth, and the risks involved if searches of materials sent to such numbers of inmates should not detect contraband, we [sustain] the policy in question.

Certainly, the inmates at the MCC cannot be compared to the admittedly more dangerous population at Leavenworth and, accordingly, justification of security are far less compelling.

**27.** Judge Frankel observed that mail can still be inspected for contraband, and where good cause is shown, outgoing mail can be read. *See Sostre v. McGinnis,* 442 F.2d 178 (2d Cir. 1971) (*en banc*), *cert. denied sub nom. Oswald v. Sostre,* 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972). We note, in addition, that Judge Frankel found no justification for the MCC's policy not to forward mail. We too fail to see any legitimate reason for the continuation of this restrictive practice.

claim of security cannot vindicate infringement of so basic a right.[28]

*Unreasonable Searches and Seizures*

When an individual is detained, he or she unfortunately relinquishes some part of those rights to privacy and protection against unreasonable searches and seizures possessed by unincarcerated members of society. Yet, few will dispute that, whatever the circumstances, the existence of a realm in which privacy is safeguarded is fundamental to decent treatment of an inmate. *Cf. Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Indeed, every effort should be made to preserve those conditions which foster human dignity. *See Bonner v. Coughlin,* 517 F.2d 1311, 1319 (7th Cir. 1975). Two practices at the MCC, the removal of inmates during room searches and bodily strip searches, denigrate this basic right.

### a. *Strip Searches*

■ By far the most humiliating and degrading procedure at the MCC is the so-called "strip search." After receiving a visitor, every inmate is, without cause, routinely ordered to strip naked and to display his armpits and the bottom of his feet. If a male, he must lift his genitals, and bend over to spread his buttocks for visual inspection. The vaginal and anal cavities of female inmates are also scrutinized. Judge Frankel left the basic strip-search procedures undisturbed, but found that anal and genital searches "plunge" the inmate into a "deep level of degradation and submission" not warranted by the record before him. *See* 439 F.Supp. at 147. He prohibited inspection of the genitals and anus unless there is probable cause to believe that the inmate is concealing contraband.

While other courts have permitted searches of body cavities where a substantial security justification has been demonstrated, in this case appellants proved only one instance in the MCC's several years of existence when contraband was found during a body cavity inspection. The gross violation of personal privacy inherent in such a search cannot be outweighed by the government's security interest in maintaining a practice of so little actual utility. To speak plainly, in the circumstances presented by this record, the procedure shocks one's conscience. *See Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Accordingly, we affirm Judge Frankel's order on strip searches.

### b. *Room Searches*

During a formal "shakedown" at the MCC, a residential unit is cleared of inmates and a search conducted. Inmates are not permitted to observe searches of their rooms. Correctional officers also may bar an inmate from viewing the more frequent "spot" searches of a particular room. The practice was instituted ostensibly to minimize conflict between residents and officers over the search, to remove possible distractions to those conducting the search, and to thwart attempts to conceal contraband.

■ Judge Frankel held that this procedure could not be countenanced when applied to pretrial detainees. He found that correctional officers often lacked any respect for the personal possessions of inmates and were far from neat, and sometimes destructive, in conducting searches. Indeed, since inmates suspected the officers of thievery, searches were a festering source of tension. In short, the practice in actual operation, constituted a "regime of absolute and unquestionable tyranny." [29]

---

**28.** In *Smith v. Shimp,* 562 F.2d 423 (7th Cir. 1977), the Seventh Circuit upheld a practice of reading outgoing, nonprivileged mail. There is no indication in that opinion, however, whether other means of communication between inmates and outsiders were left unmonitored. In any event, we decline to follow the ruling of that court.

**29.** 428 F.Supp. at 342. Judge Frankel also required that receipts be given for seized property, and that certain minimal procedures be provided for enabling an inmate to challenge a seizure. The basic principles of due process which require the institution to account for such property are so well-established that we need not dwell long in affirming this aspect of

■ We see no reason whatsoever not to permit a detainee to observe the search of his room and belongings from a reasonable distance. This is a small privilege to grant him and reassures the detainee's already diminished sense of control over self, that he still has some small private domain, while at the same time not interfering with the institution's security concern and the removal of possible contraband. *See Giampetruzzi v. Malcolm,* 406 F.Supp. 836 (S.D. N.Y.1975). And, of course, any detainee who becomes obstructive may be removed from the vicinity of his room.

### c. *Packages*

■ Inmates at the MCC are not permitted to bring into the institution or to receive from the outside, items of personal property, including electric shavers, typewriters and wrist watches. Moreover, food packages, with the exception of one package at Christmas, are forbidden. Appellants defend these limitations, claiming that personal property brought into the jail would open the door to buying favors, gambling activities, and "strong arm tactics." The appellants also urge the food restrictions are necessary to avoid sanitation and storage problems.

Judge Frankel found these justifications meritless. He ordered the appellants to promulgate reasonable regulations to permit receipt of at least items of the sort available from the commissary.

Other institutions have far more liberal rules governing the receipt of packages than the severely restrictive regulations of the MCC. *See, e. g., Giampetruzzi v. Malcolm,* 406 F.Supp. 836, 842 (S.D.N.Y.1975) (New York City House of Detention); *Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676 (D.Mass.1973), *aff'd,* 496 F.2d 1196 (1st Cir.), *cert. denied sub nom. Hall v. Inmates of Suffolk County Jail,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974).

And there is no indication that this greater liberality has resulted in unmanageable difficulties. Since the district court's decree did no more than instruct the MCC to devise reasonable regulations regarding packages, it is not inconsistent with the tenet that prison officials should retain as much control as possible over their institutions. Appellants may appropriately place a ceiling on the permissible dollar value of goods received into the institution and restrict the number of packages. In so doing, it may satisfy its legitimate security and storage concerns but, at the same time, we are sure it will not impose draconian limitations.

### d. *Typewriters*

■ Judge Frankel decreed that inmates should be permitted to possess typewriters, for their personal use. But we can perceive no constitutional right to a typewriter as an incident to the right of access to the courts. *See Tarlton v. Henderson,* 467 F.2d 200 (5th Cir. 1972). And while it may be true, as Judge Frankel poignantly noted, that "typed papers . . . leap more vividly than handwritten ones to the watery judicial eye," such a vivid rhetorical flourish on the value of the typewriter cannot justify a gross intrusion into prison administration. In short, the MCC's judgment that the particular problems of security, storage, and theft arising from inmates' ownership of typewriters must override the desire of some to possess them.[30]

### *Attire*

■ Neither pretrial detainees nor sentenced inmates at the MCC are allowed to wear their own clothes. Instead, they are issued colored jumpsuits. Appellees claim, and the trial judge found, that these jumpsuits are garish, illfitting, degrading and humiliating to wear. Accordingly, he required the MCC to permit pretrial detainees

Judge Frankel's order. *See McClendon v. Rosetti,* 460 F.2d 111 (2d Cir. 1972).

**30.** In any event, a limited number of typewriters—one on each residential unit—are provided to inmates. Their presence, coupled with the fact that most inmates are represented by counsel and do not need typewriters on which to fashion legal documents, argue strongly against allowing personal possession of typewriters as a necessity for access to the court.

to wear their own clothes unless they volunteer to wear correctional uniforms.

We do not doubt that the jumpsuits are aesthetically obnoxious to some inmates. But the MCC has demonstrated a legitimate security interest in readily identifying inmates that outweighs the inmates' understandable desire to control their own appearance. *Cf. East Hartford Education Association v. Board of Education*, 562 F.2d 838, 860 (2d Cir. 1977) (*en banc*).

Certainly, the MCC could satisfy its need to easily identify inmates in a manner less degrading and humiliating by requiring, for example, that they wear shirts and pants of a certain type and color. Indeed, we urge them to do so. But we would be hard-pressed to decide that such questions—ultimately of taste—rise to "litigable magnitude" and are not issues to be resolved by prison administrators. *See Kaufman*, 39 Brooklyn L.Rev. xiii, xv (1973).

*Access to the Courts*

■ When this action was instituted, most attorney visits were made in the general visiting rooms during visiting hours— thereby entailing long delays, limiting the attorney's time with his client, and totally vitiating confidentiality. Moreover, attorneys frequently found it impossible to go to the MCC during the brief (4:30 to 6:30 p. m.) attorney visiting hours. Attorney visits at any other hours required 24 hours notice to the institution. As a result, an inmate's access to legal counsel was often severely constrained. Prior to trial, the MCC opened a special attorney visiting room and extended attorney visiting hours from 8 a. m. to 8 p. m., for seven days a week. The judgment requires the appellants to maintain this schedule.

Judge Frankel also ordered that the MCC make its law library physically accessible to inmates during reasonable hours, and that the library contain an adequate collection of federal law materials, including the addition of some volumes and the replacement

of others. He required the appellants to provide access to state law materials upon request.

We affirm these orders. As we made clear in *Sostre v. McGinnis, supra*, 442 F.2d at 189, "[t]he Constitution protects with special solicitude, a prisoner's access to the courts." *See also Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). Indeed, one of the most serious deprivations suffered by a pretrial detainee is the curtailment of his ability to assist in his own defense. And sentenced prisoners often experience similar frustrations in bringing their grievances to the attention of the courts. Appellants' prior practices in regard to both attorney visits and the law library unreasonably burdened the inmate's opportunity to consult with his attorney and to prepare his defense, and were properly enjoined. *See Zurak v. Regan*, 550 F.2d 86 (2d Cir. 1977).

## VIII.

We regret the prolixity of this opinion, but the nature of the questions raised in the lower court and the accumulation of detailed complaints have made such length unavoidable if we were to deal properly with the trial judge's decree. In actuality, we have here decided not one, but twenty cases relating to specific conditions at the MCC.[31] That fact, in all candor, is ominous, for it represents the growing involvement of the courts in all aspects of prison administration. Of course, such intercession is anathema to prison administrators whose decisions are scrutinized. But, in many instances, the actions of the best intended courts are counterproductive for the inmates themselves, who could sooner find redress of their grievances through nonjudicial means, such as arbitration and mediation or in this case, the Bureau of Prisons' inmate grievance procedure.

---

**31.** Except as noted in this opinion, the judgment of the district court is affirmed in all respects.

Perhaps, at this juncture, Elbert Hubbard's caution that a word to the wise is usually resented will not prove true. It is important for courts to involve themselves with those conditions that violate the Constitution. But it is equally important that courts be spared from adjudicating petty matters that do not rise to litigable magnitude and could be resolved more quickly and more satisfactorily by discussions between the inmate or his representatives and prison administrators.