590 F.2d 1224
 Bradley BELL, on behalf of himself and others similarly situated,
Plaintiffs-Appellants, Charles Mendes and Darnell Tatem, on
behalf of themselves and all others similarly
situated, Plaintiffs-Intervenors-Appellants,
v.
John R. MANSON, Commissioner, Connecticut Department of
Correction, et al., Defendants-Appellees.
 No. 1093, Docket 78-2025.
 United States Court of Appeals,
Second Circuit.
 Argued June 22, 1978.
Decided Dec. 27, 1978.
 
 Sue L. Wise, New Haven, Conn., for plaintiffs-appellants and plaintiffs-intervenors-appellants.
 Stephen J. O'Neill, Asst. Atty. Gen., Hartford, Conn. (Carl R. Ajello, Atty. Gen., Hartford, Conn., on the brief), for defendants-appellees.
 Before LUMBARD and MANSFIELD, Circuit Judges, and HOLDEN, District Judge.*
 HOLDEN, District Judge:
 The plaintiff represents a class of pretrial detainees confined at the Bridgeport Community Correctional Center (Center), a state correctional facility in Connecticut. The action was instituted by the plaintiff Bell, pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201, to obtain declaratory and injunctive relief against strip search procedures conducted by the defendant state correctional officers after return from court.[1] With agreement of counsel, the plaintiff's motion for class certification under Fed.R.Civ.P. 23(b)(1) and 23(b)(2) was granted. After an evidentiary hearing the district court concluded that the procedures used at the Center did not violate the Fourth Amendment rights of the detainees and denied their application for a preliminary injunction. Bell v. Manson, 427 F.Supp. 450 (D.Conn.1976). The complaint was then dismissed, from which the plaintiffs appeal.
 Judge Zampano described the search procedures used by the defendants:
 The testimony established that pretrial detainees are strip searched with rectal inspections upon their return to the Center after all court appearances where, as a general rule, they were in contact with attorneys, friends, relatives, and other prisoners being held in the court's 'holding cells.' Each inmate in the presence of two correctional officers in a private room is required to remove his clothing, ruffle his hair, raise his arms, open his fingers and feet, and then bend over and spread his buttocks to reveal his anus to the guards. At no time is the inmate touched by a correctional officer, nor does the evidence produced indicate that guards verbally subject an inmate to humiliation or abuse.
 427 F.Supp. at 451.
 Although the district court was mindful that pretrial detainees have a different status from convicted felons, Judge Zampano ruled that the strip and rectal searching in these circumstances was not unreasonable:
 (T)he prison officials interest in maintaining proper security outweighs the inmates' rights to be free from the embarrassing submission to strip searches upon their return from court appearances and other outside visits.
 Id. at 452.
 The district court's ruling was made without the benefit of this court's opinion in Wolfish v. Levi, 573 F.2d 118 (2d Cir. 1978), Cert. granted October 2, 1978, Sub nom. Bell v. Wolfish, --- U.S. ----, 99 S.Ct. 76, 58 L.Ed.2d 107. In Wolfish the concern was the rights of the pretrial detainees in a federal correctional center. The court of appeals affirmed the order of the district court which "left the basic strip-search procedures undisturbed" but "prohibited inspection of the genitals and anus unless there is probable cause to believe that the inmate is concealing contraband." 573 F.2d at 131.
 The court's opinion by Chief Judge Kaufman makes it clear that the holding is based on the Constitution.
 The gross violation of personal privacy Inherent in such a (body cavity) search cannot be outweighed by the government's security interest in maintaining a practice of so little actual utility. To speak plainly, in the circumstances presented by this record, the procedure shocks one's conscience. See Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). (emphasis added).
 The question of genital and anal searches of state convicted inmates, conducted without probable cause, was more recently presented to a different panel of this court in the appeal in Hurley v. Ward, 584 F.2d 609 (2d Cir. 1978). The court's opinion by Judge Mulligan refers to Wolfish and Frazier v. Ward, 426 F.Supp. 1354 (N.D.N.Y.1977), prohibiting anal and genital searches without probable cause of inmates at New York State's Clinton Correctional Facility, and goes on to point out:
 In neither Wolfish nor Frazier was significant evidence offered in support of the claim that the challenged searches were justified to prevent the introduction of contraband into the facility. Also, in both cases due to other security precautions employed at the facility the anal and genital searches were of little, if any demonstrated security value. Without reviewing all the evidence set forth in Judge Carter's opinion below in the instant case, it is clear to us that here also the gross violation of personal privacy involved in the anal/genital searches of Hurley especially in view of the physical and verbal abuse incident to the procedure far outweighed the evidence adduced by the State at the preliminary hearing to justify the searches as a prison security measure.
 At 611.
 There is no suggestion in the present case that the challenged searches were accompanied by abusive or humiliating conduct on the part of the prison officers. Neither is there any showing that indiscriminate rectal and anal examination, without probable cause, justifies the severe humiliation and gross invasion of privacy of pretrial detainees without a showing of probable cause.
 Apart from a speculative deterrent effect, there is no showing that scrutiny of genital and anal areas safeguards the security of the prison against smuggling of weapons or contraband. No comparison was offered, for instance, between security conditions of prisons employing such searches and of prisons that did not or have not done so. Commissioner Manson's generality concerning the security effect of anal and genital searches was based on his recollection of the totality of reports he received from all 10 prisons in his state without stating which prisons employed strip searches. Nor did he claim any particular prior experience with the security effectiveness of the anal and genital inspection in this particular prison or on pretrial detainees as a class. One of the prison officers at Bridgeport Community Correctional Center, on the other hand, testified that on none of the occasions when he had personally performed strip searches at that facility had he ever found a weapon or contraband on any pretrial detainee or convicted prisoner. In short, there is no showing that the security interest could not be adequately served by a strip search without the inherently humiliating anal and genital inspection. The State has not, therefore, satisfied its burden of proving compelling necessity as required by Wolfish.
 The grant of certiorari in Wolfish fosters hope that this area of the law will be enlightened by the Supreme Court. In the meantime, since Judge Zampano dismissed the complaint prior to this Court's decisions in Wolfish and Hurley, both the interests of the class represented by the plaintiff and the defendants' concern in administering the Connecticut penal system without unnecessary judicial interference will best be served by reversing the order of the district court with remand to afford the State the opportunity to establish that the security of Bridgeport Community Correctional Center requires the anal and genital inspection of pretrial detainees without probable cause.
 Reversed and remanded.
 
 LUMBARD, Circuit Judge (dissenting):
 
 1
 Plaintiff pretrial detainees question the propriety of the strip searches conducted at the Bridgeport Community Correctional Center ("BCCC"), a Connecticut prison. The district court denied plaintiffs' motion for a preliminary injunction against the BCCC's practice of searching detainees upon their return from court and from other outside visits. Since I agree with Judge Zampano's conclusion that the strip searches are, under all the circumstances "not unreasonable," I dissent from my brothers' decision to remand this action to the district court. I would affirm the dismissal of the complaint.
 
 
 2
 In refusing preliminarily to enjoin BCCC's use of routine strip search procedures, Judge Zampano recognized that "pretrial detainees may be treated as prisoners only to the extent the security, internal order, health and discipline of the prison demand." He determined, however, that
 
 
 3
 the prison officials' interest in maintaining proper security outweighs the inmates' rights to be free from the embarrassing submission to strip searches upon their return from court appearances and other outside visits.
 
 
 4
 Id. at 452.
 
 
 5
 The majority suggests that Judge Zampano's balancing of inmates' rights and prison security is improper in light of our supervening decision in Wolfish v. Levi, 573 F.2d 118 (2d Cir. 1978), cert. granted Oct. 2, 1978, sub nom. Bell v. Wolfish, 47 L.W. 3189. In that case, we repeated our earlier holdings that in federal detention centers "pretrial detainees may be subjected to only those 'restrictions and privations' which 'inhere in their confinement itself or which are justified by compelling necessities of jail administration.' " 573 F.2d at 124 (citation omitted). Specifically with regard to strip and rectal searches, we held that the procedures employed at the New York Metropolitan Correctional Center in Wolfish "shock(ed) one's conscience," and that thus the inmates' rights were not outweighed by security considerations. Id. at 131. Strip searches without anal or genital inspection could continue, but the more thorough procedure could be employed only upon probable cause to believe that an individual inmate was concealing contraband.
 
 
 6
 In Wolfish, however, we did not rule out all routine strip searches. Rather, we recognized that other cases might present a "substantial security justification," and spoke of "the circumstances presented by (that) record." 573 F.2d at 131. Those circumstances included, according to the district court, "insultingly suggestive remarks and banal but terrifying expressions of aggression . . ." by the guards. United States ex rel. Wolfish v. Levi, 439 F.Supp. 114, 147 (S.D.N.Y.1977).
 
 
 7
 It should thus be apparent that a change in either or both sides of the balance the strength of the security justification, on the one hand, and the degree of humiliation entailed by the searches, on the other might support a ruling that routine strip searches are proper. Turning to the record of the instant case, there is no indication of any of the degrading and unnecessary practices that we found in Wolfish to be violative of due process. The record shows only that a returning detainee was required in a private room to strip, bend over and spread his buttocks to reveal his anus. There was no touching or actual rectal inspection of the detainee. Moreover, there was no showing of verbal abuse or any insulting or degrading conduct.
 
 
 8
 With regard to the security justification for strip searches at the BCCC, it is obvious that the safety of all persons incarcerated in such an institution, as well as the safety of prison personnel, requires some search of prisoners returning to prison after they have been in contact with others in connection with court appearances or other outside visits. I would think that the question of how such a search can best be made in light of prison conditions, and the available prison personnel, is appropriately left to the informed judgment of the state officials charged with the management and safety of state prison facilities. As the Supreme Court observed in Procunier v. Martinez, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974):
 
 
 9
 "(C)ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities."
 
 
 10
 Accordingly, it was reasonable for Judge Zampano to credit the testimony of Commissioner Manson of the Connecticut Department of Correction that strip searches of returning detainees at BCCC are necessary to prevent or reduce the introduction of contraband into the facility, and that such searches have uncovered "razor blades, taped to toes, bottoms of feet, sharpened articles taped to the groin area, narcotics stuffed between buttocks, . . ."[1] If strip searches are confined as plaintiffs have requested, those inclined to smuggle such contraband will only be encouraged to do so, just as they are now surely deterred by the knowledge that strip searches will routinely be made.[2]
 
 
 11
 In sum, adherence to our decision in Wolfish does not require reversal of Judge Zampano's determination that the routine strip search procedures at BCCC are reasonable under all the circumstances. Nothing shown here in the practice and method of searching detainees returning to the Connecticut facility so offends any standard of decency as to violate the civil rights of the detainees.
 
 
 
 *
 Chief Judge of the United States District Court for the District of Vermont, sitting by designation
 
 
 [1]
 The complaint of the named plaintiff and that of the intervenors also requested relief from their confinement as pretrial detainees in punitive segregation. The claims on this point have not been pursued
 
 
 [1]
 The fact that we deal here with inmates' constitutional rights does not make it inappropriate to extend somewhat greater deference to the judgments of state prison officials than to those of their federal counterparts. Surely it is proper for the federal courts to acknowledge the particular familiarity of state prison officials with regard to the availability of prison personnel, the security threat posed by a prison population, the location and character of a prison facility, and other factors that give the constitutional standard of reasonableness specific meaning. I, in any event, read the oft cited language of Procunier, a case which also involved alleged constitutional violations, as requiring no less
 
 
 [2]
 I find puzzling the majority's determination to remand this case so that the state has an "opportunity to establish that the security of BCCC requires" routine strip searches of pretrial detainees. Certainly it is not necessary for the state to demonstrate that razors, small knives, narcotics and other contraband can be concealed in an inmate's genital or anal areas, nor should I think there is any question of the importance to the security of a prison facility that such articles not be in the possession of inmates
 What the majority desires is documentation of specific instances at BCCC in which contraband has been uncovered by strip searches. Such a request, however, seems to me illogical given that inmates at BCCC know in advance that they will be strip searched. Only an unusually naive inmate would attempt to smuggle contraband by concealing it on his person if he were aware that strip searches were routinely made. Thus the absence of many documented instances in which strip searches have uncovered contraband is at least equally supportive of a conclusion that such searches are a successful deterrent to prisoner smuggling as that they are an unnecessary precaution.