**Otis ALSTON, Ernest Icesom and James McGourty, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**Thomas A. COUGHLIN III, Commissioner of the New York State Department of Correctional Services, and Theodore Reid, Superintendent of Fishkill Correctional Facility, in their official capacities, Defendants.**

No. 85 Civ. 5237 (LLS).

United States District Court,
S.D. New York.

Aug. 27, 1987.

Prisoners' Legal Services of New York, Poughkeepsie, N.Y., for plaintiffs; Deborah Schneer, Dan Getman, Robert Selcov, Stephen M. Latimer, David C. Leven, of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City, for defendants; Tarquin Jay Bromley, Barbara B. Butler, Lawrence N. Rothbart, Asst. Attys. Gen., of counsel.

**OPINION AND ORDER**

STANTON, District Judge.

This is a class action brought under 42 U.S.C. § 1983 by inmates in the Fishkill Correctional Facility ("FCF") in Beacon, New York, on behalf of all persons who are or will be confined in FCF. The plaintiff class alleges that the totality of conditions caused by overcrowding at FCF subjects them to cruel and unusual punishment prohibited by the Eighth[1] and Fourteenth Amendments to the United States Constitution. Upon the testimony of expert witnesses, inmates and New York State Department of Correctional Services ("DOCS") employees, my observations during two weeks of trial held at the prison, an eight-hour inspection of FCF on one occasion[2] and an evening inspection on another, the trial exhibits and the demeanor of witnesses, I find that the conditions of confinement at FCF, taken separately or in their totality, do not violate the Eighth and Fourteenth Amendments to the United States Constitution.

### The Facility

FCF is a medium security correctional facility, denominated by DOCS as "terminal." As such, the majority of FCF inmates are assigned to the facility because they are close to their release date (e.g., parole release, conditional release or expiration of sentence). Most of these pre-release inmates come from the New York City metropolitan area and are assigned to FCF by the Division of Classification and Movement, DOCS, Albany, primarily to allow them to be closer to home prior to their release, which also allows an inmate's family easier access to him. Thus, even though this policy may result in a higher annual turnover[3] of inmates than at other maximum and medium security facilities, it per-

---

1. The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. Amend. VIII.

2. Although FCF had advance notice of the all-day inspection tour, the facility is probably too large and sprawling to allow changes which would affect my conclusions. (Cf. Kamka Tr.,

Nov. 4, 1986, p. 44). The evening inspection was made on only short prior notice. One of my two meals in the facility's main dining room was on substantially no notice.

3. Superintendent of FCF, Theodore Reid, testified that 80% of FCF's population, or 1200, turn over each year. At one time, it was 125%.

mits the inmate to re-establish, renew or strengthen his family ties before his release into the community.

Situated in rolling country in Beacon, New York, FCF consists of red brick buildings, roads, walkways and yards, and some areas of grass and trees, giving the general visual impression of the late nineteenth century hospital facility it once was, with contemporary additional buildings—except for the tall fences topped with spirals of razor-edged wire, the uniformed officers, the barred windows, locked gates and metal doors which identify it as Fishkill Correctional Facility. Inmates in green shirts, trousers and field jackets, similar to those frequently worn by automobile mechanics and service station attendants, move about from building to building singly or in small groups, talking and unescorted but under the surveillance of officers at watchposts.

There are three principal housing buildings—Main Building and Buildings 21 and 21A—separated by administrative buildings that contain industries, an infirmary and dental clinic, parole services, counseling, school, chapel and visiting facilities. The FCF kitchen is located in Building 21, at the northeast end of the complex. An underground tunnel connects the Main Building and Buildings 21 and 21A and is used during bad weather and on specially designated family visiting days.

### History of Matteawan State Hospital/Fishkill Correctional Facility

Matteawan State Hospital was opened on April 25, 1892 on a 250 acre farm in Dutchess County as a psychiatric hospital for persons ruled by the courts to be criminally insane, dangerously retarded or unfit to stand trial. Matteawan was originally designed to house a population of 550 persons.

When Matteawan opened it had an initial patient population of 261. As the numbers of persons who were adjudicated criminally insane and in need of secure confinement grew, more land was purchased and more buildings were erected.

By the mid–1960's the hospital had four major inmate/patient housing components:

1) The Main Building Complex (now called Main Building) was built over six construction phases between 1888 and 1951. It housed dangerously incapacitated males;

2) The Women's Building Complex (now called Buildings # 12 and 13) was built in five construction phases between 1906 and 1954. It housed dangerously incapacitated females;

3) The Reception Building (now called building # 21) housing areas were built in 1925 and the kitchen and dining areas were built in 1961; and

4) Building # 21A was built in 1961 as an annex for the Reception Building. It housed persons serving normal criminal sentences.

On December 31, 1962, the population of the entire Matteawan State Hospital Complex was 2,116. Plaintiffs contend that the facility was overcrowded at that time. On December 20, 1966 the population of Matteawan State Hospital had dropped to 683.

By the mid–1970's, Matteawan State Hospital complex covered 845 acres. A decision was then made to phase out Matteawan as a mental hospital.

In January, 1977, Theodore Reid was appointed Superintendent of Matteawan State Hospital and FCF. The hospital portion of the facility had a population of 310 males and 5 females for a total of 315. The population of the Elderly and Handicapped Unit in Building # 13 was 97. The population in the Diagnostic and Evaluation Unit in Building # 21A was 26. The Work Release Unit population in Building # 13 was 84. The general confinement population in Buildings # 21 and 21A was 518. The total population of the facility was 1,040. At that time half of the main building complex was closed and underwent remodeling and/or repair.

When the decision to close Matteawan was made, it was also decided that the facilities at Matteawan State Hospital, as well as the other complexes on the grounds, several of which were already in use as correctional housing and operated

by DOCS, would be best suited for a medium security correctional facility, given their open ward structures. Thus, in late 1977 Matteawan and its various components became what is now known as Fishkill Correctional Facility.

Space for housing inmates in DOCS became critical in the spring and summer of 1977. As contractors finished units in Matteawan State Hospital (main building complex), general confinement inmates were moved into those areas. Before completion of the transfer of Matteawan State Hospital inmates to Central New York Psychiatric Center at Marcy, New York, the main building complex housed general confinement prison inmates in the north half and Matteawan State Hospital patients in the south half. The population statistics for the second week in August, 1977 show 108 Matteawan patients (including 4 females) and 582 general confinement prison inmates. The next week (August 26, 1977) population figures show 65 Matteawan patients and 739 general confinement inmates, thus depicting the gradual assumption of Matteawan State Hospital space by general confinement inmate space.

The FCF population increased over the next two years. In January 1980, the general confinement population was 1,110, work release at 19 and the Elderly and Handicapped Unit at 24 for a total facility population of 1,153. At that time, plans were formulated to convert Building #13 from housing units to a service building centralizing the four pre-existing visiting areas and providing central space for counseling, parole services, ministerial services, academic programs and education administration. This made the first floor of Building #21 (which had previously been used for offices) and the visiting areas in the Main Building Complex, Building #21 and Building #21A available for inmate housing.

During this period work was also completed in the portions of the main building complex which had been undergoing remodeling and repair. Thus, by January of 1981 there were 1156 general confinement inmates and 28 work release inmates for a total population of 1184. There were still areas throughout the facility and on many housing units which had no designated use.

In 1981, DOCS came under increased population pressures because of the passage of the Violent Felony Offender Act, the Second Felony Offender Act and the reversal of New York City's previous offer to sell the correctional facilities on Rikers Island to the state. All New York State correctional facilities were reviewed by DOCS to see if any available or undesignated space could, with the addition of the necessary infrastructure, be converted into inmate housing. Several facilities were found to have space available to convert to inmate housing. Because the changeover from Matteawan State Hospital to FCF had yielded what DOCS viewed as available space, both in terms of undesignated areas and underutilized housing units, DOCS determined to add approximately 454 additional beds at FCF. These beds were, and still are, designated as Temporary Housing Capacity, which DOCS describes as a bookkeeping device to keep track of where those beds were added, because DOCS intends to remove those beds from the FCF population count when, and if, the population pressures ever decrease or new buildings give the state a capacity which exceeds intake demands. In the meantime, DOCS has built what it considers the necessary infrastructure (security staff, programs, food, clothing, housing, medical facilities, administrative staff, etc.) at FCF to support those beds in the same way it does those beds which are designated as Permanent Capacity.

During the DOCS population increase of early 1981, additional spaces were identified and converted to bed space. By April of 1981 the FCF population was 1,287, of whom 31 were work release inmates. At that time the conversion of Building #13 to a service area was completed and the first floor housing units in Building #21 were finished. This, along with modifications to seven units in Building #21A and six units on the second and third floors of Building #21, allowed FCF to increase its population to 1,634 general confinement in-

mates and 36 work release inmates for a total facility population of 1,664.

Beginning in about July 1984, FCF had an average of 96 beds vacant on a day-to-day basis because of inmates who had moved into a restricted confinement bed (Secure Confinement Area or infirmary bed) or were out of the facility at an outside hospital or "out-to-court". DOCS decided to fill forty of the vacant beds by a process known as double-encumbering.[4] This increased the total facility population without adding additional beds, or creating or converting any further housing units. Fifty-six restricted capacity beds remained "off the facility count" and continued to do so at the time of trial. In its January 1986 review of FCF, the New York State Commission on Corrections ("SCOC"), an independent "watchdog" agency, reported that the DOCS master count sheet listed the general housing capacity of FCF as follows: (1) Permanent Maximum Capacity, 1142; (2) Temporary Capacity, 531; (3) Work Release, 35; (4) Special Housing Unit, 56; (5) Hospital, 21; (6) Total, 1785. The population of FCF on November 6, 1986 was 1,696, of which 34 were in the Work Release Program and 37 in the Special Housing Unit.

The Commissioner of DOCS, Thomas A. Coughlin III, testified that the FCF infrastructure could appropriately support approximately 1700 inmates. He noted, however, that FCF would be easier to run at 1,200 from the perspective of both the inmates and staff.

*Law*

■ The Eighth Amendment, applicable to the states through the Fourteenth Amendment, imposes "the constitutional limitation upon punishments: they cannot be 'cruel and unusual.'" *Rhodes v. Chapman*, 452 U.S. 337, 345, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981). This includes punishments which, although not physically barbarous, involve the unnecessary and wanton infliction of pain, or are grossly disproportionate to the severity of the

crime. *Id.* at 346, 101 S.Ct. at 2399. Unnecessary and wanton inflictions of pain include pain "totally without penological justification." *Ibid.* (citing, *e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (deliberate indifference to medical needs)).

But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.... [T]he Constitution does not mandate comfortable prisons, and prisons ... which house persons convicted of serious crimes, cannot be free of discomfort. [T]hese are considerations properly weighed by the legislature and prison administration rather than a court.

*Rhodes*, 452 U.S. at 347, 349, 101 S.Ct. at 2399, 2400.

■ In assessing claims that conditions of confinement are cruel and unusual, courts must bear in mind that their inquiries "spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." *Bell v. Wolfish*, 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979). The role of the court is to enforce constitutional standards and to protect the constitutional rights of inmates, not to second-guess prison administrators or supervise prison administration. *Procunier v. Martinez*, 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974):

Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are respon-

4. "Double-encumbering" is the use for general population inmates of the beds of those inmates who are away in special housing, the hospital, etc.

sible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.

(footnotes omitted).

Prison administration is, moreover, a task that has been committed to the responsibility of the legislative and executive branches of government and separation of powers concerns "counsel a policy of judicial restraint." *Turner v. Safley,* — U.S. —, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987).

■ Inmates retain certain constitutional rights, but those rights are subject to restrictions and limitations. *Bell v. Wolfish,* 441 U.S. 520, 545–46, 99 S.Ct. 1861, 1877–78, 60 L.Ed.2d 447 (1979).

Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.... The fact of confinement as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights.... There must be a mutual accommodation between institutional needs and objec-

tives and the provisions of the Constitution that are of general application. *Id.* at 546, 99 S.Ct. at 1878 (citations omitted). Maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of inmates. *Ibid.*

"No static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.' " *Rhodes,* 452 U.S. at 346, 101 S.Ct. at 2399 (citation omitted). Eighth Amendment judgments should be informed by objective factors to the maximum extent possible. *Ibid.*

The specific categories of Eighth Amendment concern were set forth by the Second Circuit in *Wolfish v. Levi,* 573 F.2d 118, 125 (2d Cir.1978), *rev'd on other grounds, sub nom., Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The Second Circuit there stated that sentenced inmates are entitled only to "adequate food, clothing, shelter, sanitation, medical care, and personal safety." 573 F.2d at 125. Limited work hours and delay before receiving education "do not inflict pain, much less unnecessary and wanton pain; deprivations of this kind simply are not punishments." *Rhodes,* 452 U.S. at 348, 101 S.Ct. at 2400.

Concurring in *Rhodes,* joined by Justices Blackmum and Stevens, Justice Brennan itemized the conditions to be examined:

In determining when prison conditions pass beyond legitimate punishment and become cruel and unusual, the "touchstone is the effect upon the imprisoned." *Laaman v. Helgemoe,* 437 F.Supp. [269], at 323 [D.N.H.1977]. The court must examine the effect upon inmates of the condition of the physical plant (lighting, heat, plumbing, ventilation, living space, noise levels, recreation space); sanitation (control of vermin and insects, food preparation, medical facilities, lavatories and showers, clean places for eating, sleeping, and working); safety (protection

from violent, deranged, or diseased inmates, fire protection, emergency evacuation); inmate needs and services (clothing, nutrition, bedding, medical, dental, and mental health care, visitation time, exercise and recreation, educational and rehabilitative programming); and staffing (trained and adequate guards and other staff, avoidance of placing inmates in positions of authority over other inmates); See ibid.; *Ramos v. Lamm,* 639 F.2d [559] at 567–581 [10th Cir.1980]. When "the cumulative impact of the conditions of incarceration threatens the physical, mental, and emotional health and well-being of the inmates and/or creates a probability of recidivism and future incarceration," the court must conclude that the conditions violate the Constitution. *Laaman v. Helgemoe, supra,* at 323.

*Rhodes,* 452 U.S. at 364, 101 S.Ct. at 2408 (concurring opinion).

My findings concerning the conditions at FCF follow that outline.

## I. Physical Plant

### General Physical Plant Maintenance Issues

Plaintiffs allege that "[n]ecessary repair work to the physical plant, fixtures, and equipment is frequently delayed for months, and in some cases have been put off for over a year." Pl. Post-trial Proposed Findings of Fact ("Pl. Findings"), at 33. Plaintiffs' rely, *inter alia,* on (1) minutes from FCF's Environmental Services Committee[5] ("ESC") concerning ongoing physical plant problems; (2) repeated capital budget requests for (a) rehabilitating toilets and showers for inmate housing units and (b) replacing heating systems; (3) testimony of inmate Happel that his room in Housing Unit ("HU") R–East had

chunks of plaster missing from the wall, a leaking overhead pipe, and "a flood" of water coming through the wall and a radiator; (4) design defects in the mechanisms for opening and closing the windows in Building 21A; (5) testimony by inmate Nilsson that it took maintenance two weeks to replace a broken window in his room; and (6) a broken step near the entrance to Housing Unit J in Building 21A that was not repaired for several months.

William Butler, FCF Plant Superintendent for 14 years, testified that the FCF physical plant was big, structurally sound and continually updated. He also testified that FCF has an aggressive preventive maintenance program and that the maintenance staff attempts timely to repair any malfunctioning equipment or facilities. Superintendent Reid also testified that no major equipment or facilities, such as kitchen equipment or water and heating systems, were in need of repair.

A review of maintenance staff responses to (1) the ESC's inspection reports, (2) the annual health and safety inspection conducted by FCF staff pursuant to DOCS directive, (3) New York Department of Health Annual Inspections, and (4) work orders (about 800 each month) logged in the maintenance staff's logbook (copies of which are also kept by the administrative department), establishes that for the most part necessary repair work is meticulously identified and performed.

Plaintiffs' expert witness, Mr. Gordon Kamka, prison consultant, inspector, and former warden, testified that although the facility was old, there was a maintenance program to address and resolve problems of leakage and plumbing, and that no part of the facility was left unattended in the general area of maintenance. Mr. Kamka also testified that during his tour of FCF

5. DOCS requires each state facility to have an ESC, which monitors fire, safety, sanitation and other environmental concerns with respect to the facility's operations. The ESC regularly inspects the facility to determine whether there are needed repairs or areas requiring additional sanitary attention. The ESC has twelve members. The chairperson is the Deputy Superintendent for Administrative Services, and other members include the other deputy superintend-

ents, nurse administrator, plant superintendent, maintenance supervisor, fire and safety officer and a representative from each of the three employee bargaining units. The committee divides itself into six inspection teams of two members each who inspect different areas of the facility on a rotating basis between the ESC meetings held every six weeks. At the meetings the members report on the remedies of past deficiencies and the fixing of current ones.

he did not see evidence of broken or unrepaired windows. He testified that if there had been a large number he would have noted it.

Assuming Mr. Happel's testimony about the condition of his room to be clinically accurate, no testimony was presented to establish that such conditions were widespread, rather than an isolated occurrence. Based on my tour of all of the housing units in FCF and all other testimony, I conclude that the condition of Mr. Happel's room was not typical of the conditions in other rooms.

FCF makes Capital Budget Requests for major renovation or building projects each year. These requests are in addition to the facility's operating funds. As in all governmental processes which are controlled by fiscal considerations and evaluations made by agencies beyond FCF's administrators' control, some projects are funded and some are not, depending upon available state resources. Superintendent Reid testified that whether or not the Budget Requests are granted, FCF is able to maintain the Facility and perform renovations and repairs with the funding provided for such activities.

Although there was inmate testimony concerning isolated instances of delays in repairs, and the failure to repair, I conclude that FCF is able to make the necessary repairs to the physical plant that keep it from posing a threat to the health and safety of the inmates.

1) Lighting.

Plaintiffs claim that housing unit HU–15–2's exit light "was repeatedly reported as broken from November 25, 1984 through at least September 8, 1985." Pl. Findings, at 34.

Based on my inspection of FCF and the other evidence and testimony presented, I find that lighting at FCF is adequate.

2) Heat.

Plaintiffs contend that there are "frequent problems with the heating ... throughout the facility.... Areas of the facility do not or have not had an adequate amount of heat at various times." Pl. Findings, at 50.

There was inmate testimony of instances of inadequate heat in certain housing units. There have been breakdowns of the heating systems at FCF. The maintenance staff attempts to repair them promptly. FCF has put new heating systems in Buildings 21 and 13, and parts of the Main Building heating system have been replaced. There was inmate testimony that at times they had to wear outdoor clothing indoors, but there was no showing of adverse health effects experienced as a result of heating breakdowns. FCF is also addressing the design problem of the windows (louver crank strips threads in trying to seal) in Building 21A with Capital Budget Requests and the interim use of plastic sheeting to seal the windows to avoid wintertime drafts.

The present state of the heating system has flaws and problems but is generally adequate and does not threaten the health of the inmates.

3) Plumbing—Toilets, Showers and Sinks

Plaintiffs contend that the number of showers, toilets and sinks in most of the housing units is insufficient to meet the basic physiological needs of the inmates living in those units. Plaintiffs first rely on the standard established by the American Correctional Association ("ACA") which states that a multiple occupancy room should provide "[t]oilet and shower facilities at a minimum of one operable toilet and shower for every eight occupants" and "[o]ne operable wash basin with hot and cold running water for every six occupants." ACA Standard 2–4131. This standard is labeled "important" by the ACA as opposed to "essential" or "mandatory". Plaintiffs also rely on the standards established by DOCS which require toilets, sinks and showers in the ratio of one to ten inmates in dormitory housing. 7 N.Y.C. R.R. 320.3.

In my analysis of whether the numbers of showers, sinks and toilets are sufficient, I rely on the total capacity listings for each

housing unit from Defendants' Exhibit B. The following table shows the capacity of each of the housing units, the numbers of showers, sinks and toilets in each unit, and the resulting ratio of showers, sinks and toilets to inmates in each housing unit. The figures for numbers of toilets, showers and sinks are taken from Defendants' Exhibit C. The number of toilets in each unit includes urinals.

## MAIN BUILDING

| Unit | Capacity | No. of Showers | Ratio of Showers to Inmates | No. of Sinks | Ratio of Sinks to Inmates | No. of Toilets | Ratio of Toilets to Inmates |
|---|---|---|---|---|---|---|---|
| 1 | 52 | 2 | 1:26 | 4 | 1:13 | 4 | 1:13 |
| 2 | 49 | 7 | 1:7 | 6 | 1:8.17 | 8 | 1:6.13 |
| 3–1 | 27 | 2 | 1:13.5 | 29 | 1:0.93 | 30 | 1:0.9 |
| 3–2 | 29 | 2 | 1:14.5 | 35 | 1:0.83 | 33 | 1:0.88 |
| 4–1 | 28 | 1 | 1:28 | 30 | 1:0.93 | 31 | 1:0.9 |
| 4–2 | 28 | 1 | 1:28 | 30 | 1:0.93 | 32 | 1:0.88 |
| 5–1 | 27 | 3 | 1:9 | 4 | 1:6.75 | 6 | 1:4.5 |
| 5–2 | 27 | 1 | 1:27 | 2 | 1:13.5 | 3 | 1:9 |
| 6–1 | 27 | 3 | 1:9 | 4 | 1:6.75 | 5 | 1:5.4 |
| 6–2 | 27 | 1 | 1:27 · | 2 | 1:13.5 | 3 | 1:9 |
| 9–1 | 27 | 3 | 1:9 | 2 | 1:13.5 | 6 | 1:4.5 |
| 9–2 | 27 | 1 | 1:27 | 2 | 1:13.5 | 3 | 1:9 |
| 10–1 | 27 | 3 | 1:9 | 4 | 1:6.75 | 6 | 1:4.5 |
| 10–2 | 27 | 1 | 1:27 | 2 | 1:13.5 | 3 | 1:9 |
| 11–1 | 24 | 3 | 1:8 | 2 | 1:12 | 6 | 1:4 |
| 11–2 | 24 | 1 | 1:24 | 2 | 1:12 | 3 | 1:8 |
| 12–1 | 24 | 3 | 1:8 | 4 | 1:6 | 6 | 1:4 |
| 12–2 | 24 | 1 | 1:24 | 2 | 1:12 | 3 | 1:8 |
| 13–2 | 24 | 3 | 1:8 | 3 | 1:8 | 3 | 1:8 |
| 14 | 35 | 4 | 1:8.75 | 29 | 1:1.21 | 29 | 1:1.21 |
| 15–2 | 24 | 2 | 1:12 | 3 | 1:8 | 3 | 1:8 |
| 16–2 | 36 | 5 | 1:7.2 | 7 | 1:5.14 | 26 | 1:1.38 |
| 17–19 | 25 | 3 | 1:8.33 | 27 | 1:0.93 | 27 | 1:0.93 |
| 21 | 30 | 2 | 1:15 | 3 | 1:10 | 4 | 1:7.5 |
| 22 | 25 | 4 | 1:6.25 | 5 | 1:5 | 9 | 1:2.78 |

## BUILDING 21

| Unit | Capacity | No. of Showers | Ratio of Showers to Inmates | No. of Sinks | Ratio of Sinks to Inmates | No. of Toilets | Ratio of Toilets to Inmates |
|---|---|---|---|---|---|---|---|
| 1/East | 52 | 4 | 1:13 | 4 | 1:13 | 6 | 1:8.67 |
| 1/West | 42 | 4 | 1:10.5 | 3 | 1:14 | 6 | 1:7 |
| 1/Cntr. | 53 | 4 | 1:13.25 | 6 | 1:8.83 | 6 | 1:8.83 |
| A/East | 56 | 4 | 1:14 | 6 | 1:9.33 | 9 | 1:6.2 |
| A/Cntr. | 47 | 4 | 1:11.75 | 6 | 1:7.83 | 10 | 1:4.7 |
| A/West | 56 | 4 | 1:14 | 5 | 1:11.2 | 9 | 1:6.2 |
| B/East | 56 | 4 | 1:14 | 6 | 1:9.33 | 9 | 1:6.2 |
| B/Cntr. | 47 | 4 | 1:11.75 | 6 | 1:7.83 | 10 | 1:4.7 |
| B/West | 56 | 4 | 1:14 | 5 | 1:11.2 | 10 | 1:5.6 |
| C/Cntr. | 51 | 4 | 1:12.75 | 6 | 1:8.5 | 10 | 1:5.1 |

## BUILDING 21A

| Unit | Capacity | No. of Showers | Ratio of Showers to Inmates | No. of Sinks | Ratio of Sinks to Inmates | No. of Toilets | Ratio of Toilets to Inmates |
|---|---|---|---|---|---|---|---|
| I | 57 | 4 | 1:14.25 | 7 | 1:8.14 | 11 | 1:5.18 |
| J | 54 | 4 | 1:13.5 | 7 | 1:7.71 | 11 | 1:4.91 |
| K | 54 | 4 | 1:13.5 | 7 | 1:7.71 | 11 | 1:4.91 |
| L | 54 | 4 | 1:13.5 | 7 | 1:7.71 | 10 | 1:5.4 |
| M | 54 | 3 | 1:18 | 7 | 1:7.71 | 11 | 1:4.91 |
| N | 54 | 4 | 1:13.5 | 7 | 1:7.71 | 11 | 1:4.91 |
| O | 28 | 1 | 1:28 | 32 | 1:0.88 | 35 | 1:0.8 |
| P | 28 | 1 | 1:28 | 32 | 1:0.88 | 35 | 1:0.8 |
| Q | 30 | 1 | 1:30 | 29 | 1:1.03 | 30 | 1:1 |
| R/East | 40 | 3 | 1:13.33 | 4 | 1:10 | 6 | 1:6.67 |
| R/West | 24 | 3 | 1:8 | 4 | 1:6 | 5 | 1:4.8 |
| S | 13 | 3 | 1:4.33 | 7 | 1:1.86 | 8 | 1:1.63 |

Mr. Butler described plans to add one shower to each of housing units 5–2, 7–2, 10–2 and 12–2 in the Main Building. Toilets and sinks are also located in the program areas (e.g., visiting area, chapel, school, gym, law library and inmate organization areas). Toilets, sinks and showers are also located in some recreational dayrooms.

The above table assumes that the facilities are operable at all times. There was trial testimony, however, that some of the toilet, shower and sink facilities were sometimes inoperable. Thus, on occasion there was a greater number of inmates per toilet, shower and sink.

■ This is not determinative as to whether the physiological needs of the inmates were met, but rather, is one factor to be considered by the Court. Although the ACA and DOCS standards constitute appropriate goals formulated by experts in the field, and may provide guidance for prison administrators or other branches of the government, they do not establish constitutional minima. *Rhodes v. Chapman*, 452 U.S. at 348, n. 13, 101 S.Ct. at 2409, n. 13; *Bell v. Wolfish*, 441 U.S. at 544, n. 27, 99 S.Ct. at 1876, n. 27; *Miles v. Bell*, 621 F.Supp. 51, 60 (D.Conn.1985).

The Court must look at the effect of the challenged condition upon the imprisoned. *Rhodes*, 452 U.S. at 364, 101 S.Ct. at 2408 (Brennan, J., concurring). The inmates who testified described the adverse effects created by this shortage or insufficiency of facilities. The most obvious effects were that inmates had to wait to use the showers, particularly during the busy times of the day, and conflicts arose over the limited facilities. Inmates, however, also testified that they took showers in other housing units when their own unit's showers were unavailable. In its January 1986 review of FCF, the SCOC noted that no inmate complaints surfaced in the area of sanitary facilities.

The question then arises as to what harm is caused inmates who are forced to wait to use shower facilities. No evidence of any institutional restriction on the number of showers allowed inmates per week was presented. Inmates have access to shower facilities throughout the day and evening, 16 hours a day, seven days a week. Their immediate unavailability on demand is an inconvenience which may be considered as part of the penalty criminal offenders pay for their offenses against society. *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399.

The record in this case shows that plaintiffs are often forced to wait, but there is no evidence that this significantly affects their health or cleanliness. On the contrary, although most of the shower, toilets and sink facilities fail to meet the ACA and DOCS standards, these facilities do meet the inmates' basic physiological needs.

Plaintiffs also contend that "[r]epairs and maintenance to sanitary facilities are constantly required, but are frequently delayed for long periods of time." Pl. Findings, at 29.

Although some sanitary fixtures are old, FCF maintains and repairs these fixtures on a daily basis to keep them in proper working order.

The only testimony concerning an inmate contracting a disease from an alleged unsanitary facility was inmate Happel's, that bathrooms on HU 11–1 in the beginning of 1985 were not properly disinfected, that the sinks were filthy and grimy, and that he developed a fungus (which might have been athlete's foot) from using the showers in Housing Unit R–East. One of the tasks of the porter inmates is to keep the bathrooms clean. When these porters do not perform their job properly, the result is a dirty bathroom. Mr. Happel himself testified that he spends only twenty minutes of a three-hour work period mopping the area to which he is assigned as a housing unit porter. No reason was given why the solution to inmate claims of dirty facilities does not lie in better cleaning of those facilities by the inmates themselves.

### 4) Ventilation

The plaintiffs claim that "[t]he ventilation in the welding shop is inadequate" (Pl. Findings, at 52) and it apparently is. The administration tried to remedy the problem by installing a new ventilation system in the summer of 1984. Superintendent Reid testified that the administration continues to investigate possible ways to improve the system.

Mr. Gaffney also testified that there was inadequate ventilation in Housing Unit 1, Main Building during the summer he was housed there. No testimony was presented that this resulted in health problems to Mr. Gaffney or any other inmate.

### 5) Living Space—Residential Areas

Some cells (since inmates are never locked in them, they serve merely as rooms and inmates and staff alike refer to them as rooms) house 2, 3 or 4 roommates. The great majority of inmates, however, live in dormitories modified to provide individual cubicles: personal areas in which a bed, chair, locker and open shelf space for personal property are enclosed by low walls about four feet high, open in front to a passageway, but marking a division of that unit from its neighbor. The cubicle encloses about 35 square feet of space. Plaintiffs contend that the cubicle space is insufficient to meet the personal space and privacy needs of the inmates living in the dormitories.

There is an individual dayroom separate from, but adjoining each housing unit, except for the twenty-eight man units in the Main Building in which two housing units share a double-sized dayroom located between the two units. There are chairs, tables and a cable color television set in each dayroom.

Theodore Reid became Superintendent of FCF in early 1977, when Matteawan State Hospital was being converted to FCF. He decided that each inmate should have a clearly defined personal space. He thus "abandoned the open barracks dormitory setting found in most medium security correctional facilities in this country and had installed modular cubicles in each dormitory unit." Reid Aff., sworn to October 27, 1986, ¶ 22. The cubicle life inherently involves exposure, and only a limited sense of privacy. Superintendent Reid believes that this forced interaction provides rehabilitation, reflecting the fact that people in the outside community do not live in cells. That is a reasonable perception, and a strategy well within the jurisdiction of the prison administrator. Superintendent Reid testified that his primary concern was that the house correction officer be able to see the inmates. "If the inmate is standing he can be seen. If he is sitting [in his "cube"] he can be seen. If he is lying down he cannot. So when he was lying down, unless someone came to the end of his module, he would have that sense of privacy." T. Reid, Tr. at 104.

Plaintiffs' experts Mr. Verne Cox, a researcher in the area of prison crowding, and Mr. Kamka both testified that the cubicle space is insufficient to meet the personal space and privacy needs of the inmates living in the dormitories. Plaintiffs rely on the standard established by the ACA, which states that a multiple occupancy room should provide "[a] minimum floor area of 50 square feet per occupant in the sleeping area." ACA Standard 2–4131. This standard is labeled "important" by the ACA, rather than "essential" or "mandatory."

Although not beyond cavil,[6] I accept defendants' calculations of the square footage of living space per inmate (not including recreational dayrooms) (Defendants' Exhibit B) by taking the total square foot-

---

**6.** These calculations may, as plaintiffs argue, suffer infirmities such as (a) the inclusion of "access and egress" space, contrary to ACA's August 1983 interpretation of ACA 2–4131, and (b) inclusion in the open space calculations for Units I through N of space actually consumed by 1, 2 and 4–man rooms—but nonetheless they show on the whole that plaintiffs' assertion that the proper measure is only the dimensions of a seven-by-five foot cubicle is too limited and artificial.

age of the room in which cubicles are placed and dividing by the number of inmates. This shows, after arithmetic corrections by the Court:

| | | Square Footage per Inmate |
|---|---|---|
| Building 21–A—Total Capacity = 490 | (includes Secure Confinement Areas) | |
| Housing Unit I | (Capacity = 57) | |
| | Front Dorm (15) | 81.47 |
| | Rear Dorm (28) | 162 |
| | Single rooms (4) | 63 and 72 |
| | Double rooms (3) | 72 and 76 |
| | Four-man rooms (1) | 64 |
| Housing Unit J | (Capacity = 54) | |
| | Front Dorm (15) | 81.47 |
| | Rear Dorm (25) | 181.44 |
| | Single rooms (4) | 63, 70, 72 and 80 |
| | Double rooms (3) | 72 and 76 |
| | Four-man rooms (1) | 68 |
| Housing Unit K | (Capacity = 54) | |
| | Front Dorm (15) | 81.47 |
| | Rear Dorm (25) | 181.44 |
| | Single rooms (4) | 63 and 72 |
| | Double rooms (3) | 72 and 76 |
| | Four-man room (1) | 64 |
| Housing Unit L | (Capacity = 54) | |
| | Front Dorm (15) | 81.47 |
| | Rear Dorm (25) | 178.20 |
| | Single rooms (4) | 63, 70, and 72 |
| | Double rooms (3) | 72 and 76 |
| | Four-man room (1) | 64 |
| Housing Unit M | (Capacity = 54) | |
| | Front Dorm (15) | 81.47 |
| | Rear Dorm (25) | 181.44 |
| | Single rooms (4) | 70 and 80 |
| | Double rooms (2) | 72 and 76 |
| | Four-man room (1) | 68 |
| Housing Unit N | (Capacity = 54) | |
| | Front Dorm (15) | 81.47 |
| | Rear Dorm (25) | 181.44 |
| | Single rooms (4) | 70 and 80 |
| | Double rooms (3) | 72 and 76 |
| | Four-man room (1) | 68 |
| Housing Unit O | (Capacity = 28) (Secure Confinement Area) | |
| | Single rooms (28) | 80 and 81 |
| Housing Unit P | (Capacity = 28) (Secure Confinement Area) | |
| | Single rooms (28) | 80 and 81 |
| Housing Unit Q | (Capacity = 30) | |
| | Single rooms (30) | 80 and 81 |

| | | Square Footage per Inmate |
|---|---|---|
| Building 21–A—Total Capacity = 490 (includes Secure Confinement Areas) | | |
| Housing Unit R/W | (Capacity = 24) (Behavior Intervention Unit) | |
| | Dorm 1 (8) | 40.93 |
| | Dorm 2 (8) | 40.31 |
| | Dorm 3 (4) | 58.12 |
| | Single rooms (4) | 72.8 |
| Housing Unit R/E | (Capacity = 40) | |
| | Dorm (32) | 92.5 |
| | Single rooms (4) | 80 |
| | Double rooms (2) | 85.5, 82.5 |
| Housing Unit S | (Capacity = 13) (Presently vacant) | |
| | Dorm (11) | 161.45 |
| | Single rooms (2) | 140 |
| Main Building—Total Capacity = 724 (includes Secure Confinement Area) | | |
| Housing Unit 1 | (Capacity = 52) | |
| | Dorm (38) | 89.9 |
| | Single rooms (6) | 63 |
| | Double rooms (4) | 66 |
| Housing Unit 2 | (Capacity = 49) | |
| | Dorm (46) | 88.9 |
| | Single rooms (3) | 65.5 |
| Housing Unit 3–1 | (Capacity = 27) | |
| | Single rooms (27) | 77.1 |
| Housing Unit 3–2 | (Capacity = 29) | |
| | Single rooms (29) | 77.1 |
| Housing Unit 4–1 | (Capacity = 28) (Reception) | |
| | Single rooms (28) | 77.1 |
| Housing Unit 4–2 | (Capacity = 28) (Secure Confinement Area) | |
| | Single rooms (28) | 77.1 |
| Housing Unit 5–1 | (Capacity = 27) | |
| | Dorm (24) | 90.4 |
| | Single rooms (3) | 96 |
| Housing Unit 5–2 | (Capacity = 27) | |
| | Dorm (24) | 90.4 |
| | Single rooms (3) | 96 |
| Housing Unit 6–1 | (Capacity = 27) | |
| | Dorm (24) | 100.5 |
| | Single rooms (3) | 96 |
| Housing Unit 6–2 | (Capacity = 27) | |
| | Dorm (24) | 97.7 |
| | Single rooms (3) | 96 |
| Housing Unit 9–1 | (Capacity = 27) | |
| | Dorm (24) | 99 |
| | Single rooms (3) | 96 |
| Housing Unit 9–2 | (Capacity = 27) | |
| | Dorm (24) | 99 |
| | Single rooms (3) | 96 |

| | | Square Footage per Inmate |
|---|---|---|
| <u>Main Building</u>—Total Capacity = 724 | (includes Secure Confinement Areas) | |
| Housing Unit 10–1 | (Capacity = 27) | |
| | Dorm (24) | 103.5 |
| | Single rooms (3) | 96 |
| Housing Unit 10–2 | (Capacity = 27) | |
| | Dorm (24) | 103.5 |
| | Single rooms (3) | 96 |
| Housing Unit 11–1 | (Capacity = 24) | |
| | Dorm (24) | 99.2 |
| Housing Unit 11–2 | (Capacity = 24) | |
| | Dorm (24) | 99.2 |
| Housing Unit 12–1 | (Capacity = 24) | |
| | Dorm (24) | 99.2 |
| Housing Unit 12–2 | (Capacity = 24) | |
| | Dorm (24) | 99.2 |
| Housing Unit 13–2 | (Capacity = 24) | |
| | Dorm (24) | 99.2 |
| Housing Unit 14 | (Capacity = 35) | |
| | Dorm (10) | 140.35 |
| | Single rooms (25) | 80.5 |
| Housing Unit 15–2 | (Capacity = 24) | |
| | Dorm (24) | 81.5 |
| Housing Unit 16–2 | (Capacity = 36) | |
| | Dorm (10) | 140.35 |
| | Single rooms (26) | 80.5 |
| Housing Unit 17–19 | (Capacity = 25) | |
| | Single rooms (25) | 77 |
| Housing Unit 21 | (Capacity = 30) | |
| | Dorm (10) | 93.3 |
| | Single rooms (20) | 88 |
| Housing Unit 22 | (Capacity = 25) | |
| | Single rooms (1) | 96 |
| | Double rooms (9) | 51, 54, 57, and 60 |
| | Triple rooms (2) | 48 and 56 |
| <u>Building 21</u>—Total Capacity = 516 | | |
| Housing Unit C/Center | (Capacity = 51) | |
| | Single rooms (9) | 106.2, 103.1, 91.4, 82.8, 104, 120, 105.6, 102 |
| | Double rooms (3) | 77, 88.5, 67.3 |
| | Triple rooms (4) | 62.9, 68, 72, 96.3 |
| | Four-man rooms (6) | 67.5, 71.3, 73.8 |
| Housing Unit B/West | (Capacity = 56) | |
| | Dorm (12) | 111 |
| | Single rooms (7) | 73.6, 104.5, 95, 103.4, 120.3 |
| | Double rooms (2) | 61.5, 62.5 |
| | Triple rooms (7) | 52.5, 69.3, 74.7, 67.6, 61.3, 56, 63.6 |
| | Four-man rooms (3) | 56.3 |
| Housing Unit B/Center | (Capacity = 47) | |
| | Dorm (8) | 65 |
| | Single rooms (6) | 91.2, 103.4, 111.5, 123.9, 109.5, 104.4 |
| | Double rooms (4) | 61.9, 79.1, 107, 78.1 |
| | Triple rooms (7) | 81.6, 77.9, 73.7, 68.3, 73.1, 80.6 |
| | Four-man rooms (1) | 60.9 |

| Building 21—Total Capacity = 516 | | Square Footage per Inmate |
|---|---|---|
| Housing Unit B/East | (Capacity = 56) | |
| | Dorm (12) | 114.3 |
| | Single rooms (7) | 113.2, 75.6, 95.4, 102.8, 103.8 |
| | Double rooms (2) | 62.3, 60.4 |
| | Triple rooms (7) | 67.2, 51.6, 74, 65, 50.6, 61.1 |
| | Four-man rooms (3) | 54.1, 56.3 |
| Housing Unit 1/East | (Capacity = 52) | |
| | Dorm 1 (5) | 90.2 |
| | Dorm 2 (33) | 100.8 |
| | Dorm 3 (7) | 133.2 |
| | Dorm 4 (7) | 87.7 |
| Housing Unit 1/Center | (Capacity = 53) | |
| | Double rooms (1) | 93 |
| | Triple rooms (1) | 50.4 |
| | Four-man rooms (3) | 58.2, 63.7, 81.3 |
| | Five man rooms (1) | 58 |
| | Six man rooms (4) | 62.7, 66.2, 66.4, 63.3 |
| | Seven man room (1) | 58.8 |
| Housing Unit 1/West | (Capacity = 42) | |
| | Dorm 1 (11) | 106 |
| | Dorm 2 (10) | 64.9 |
| | Dorm 3 (21) | 63.8 |
| Housing Unit A/East | (Capacity = 56) | |
| | Dorm (12) | 118.5 |
| | Single rooms (7) | 74.9, 94.4, 98.6, 100.7, 117.4 |
| | Double rooms (2) | 65.4 and 66 |
| | Triple rooms (7) | 47.6, 67.1, 65.1, 58.1, 52.9, 62.2, 73.3 |
| | Four-man rooms (3) | 53.4, 55.6, 56.3 |
| Housing Unit A/Center | (Capacity = 47) | |
| | Dorm (4) | 66.5 |
| | Dorm (4) | 66.5 |
| | Single rooms (5) | 81.4, 99.9, 100.6, 111, 100 |
| | Double rooms (5) | 60, 65.6, 69, 78, 61.5 |
| | Triple rooms (8) | 68, 72, 76.3, 71.8, 74, 78.9, 80.2, 80 |
| Housing Unit A/West | (Capacity = 56) | |
| | Dorm (12) | 111 |
| | Single rooms (6) | 99.3, 92.1, 72.7, 86.9, 100.4, 95.2 |
| | Double rooms (4) | 60.5, 77.6, 62.7, 59.7 |
| | Triple rooms (6) | 57.3, 65, 65.6, 59.1, 62.9, 77.6 |
| | Four-man rooms (3) | 52.8, 53.4, 51.1 |

A review of these calculations reveals that nearly all of the housing units provide the ACA standard of fifty square feet of living space.

As was discussed in the foregoing section on toilets, showers and sinks, a failure to meet ACA standards is in any event only one factor to be considered by the Court. While the ACA standards represent goals formulated by experts in the field, and may provide guidance for prison administrators or other branches of the government, they do not establish constitutional minima. *Rhodes v. Chapman,* 452 U.S. at 348, n. 13, 101 S.Ct. at 2400, n. 13; *Bell v. Wolfish,* 441 U.S. at 544, n. 27, 99 S.Ct. at 1876, n. 27; *Miles v. Bell,* 621 F.Supp. 51, 60 (D.Conn.1985).

Plaintiffs do not claim that the cubicle space in the dormitories provides each in-

mate with less than 32 square feet of personal space. In *Rhodes*, the court held that double celling in a maximum-security state prison, which provided an inmate with 31½ square feet (one-half of a cell measuring 63 square feet) did not constitute cruel and unusual punishment. Here, as in *Rhodes*, an inmate is not confined to his sleeping cubicle. He is able to spend a considerable part of the day in the dayroom, recreation yards, dining and program areas. In short, plaintiffs fall far short of establishing that their personal living space is unconstitutionally small.

Plaintiffs' expert Mr. Cox testified that partitions are better than open dorms, and that the actual space allotted is much less significant than the number of unwanted or uncontrollable social interactions. This astute observation invokes the constitutional right to privacy, *Carey v. Population Services Int'l*, 431 U.S. 678, 684–86, 97 S.Ct. 2010, 2016–17, 52 L.Ed.2d 675 (1977), which may be restricted to the extent necessary to further the penal institution's legitimate goals and policies, *Bell v. Wolfish*, 441 U.S. at 546–47, 99 S.Ct. at 1878, but does not vanish altogether. The limited sense of privacy provided by the cubicle arrangement—as contrasted to the more private and isolated security of housing in a maximum security cell—is consciously designed to serve FCF's legitimate security and rehabilitative goals. The inmates are no more crowded than they would be in a military barracks, and less crowded than they might be aboard a naval vessel; indeed, the cubicle arrangements give the inmates more defined personal space and facilities for the possession and display of personal articles than any entry-level military counterpart.

For the reasons stated above, I find that the cubicles adequately meet inmates' personal space and privacy needs.

### 6) Noise Levels

Plaintiffs contend that "[c]ubicle style dormitory housing at Fishkill creates constant noise problems for prisoners. Noise on the dormitory units may be so high that prisoners are unable to sleep, rest or read. Noise levels are a constant source of ten-sion. Fights and confrontations frequently erupt over noise." Pl. Findings, at 17.

Plaintiffs point to the 1986 SCOC report which stated that normal communication was almost impossible in the evening, when most inmates are in the housing units. I visited housing units, chosen by plaintiffs, in the evening and heard the noise. Its levels are within the normal volume to be expected in a dormitory housing vigorous and vocal young men. While some inmates testified that the noise levels in the housing units prevented them from reading or studying in their "cube" or sleeping during the day, there was no evidence of significant adverse health effects caused by noise. Daytime leisure activity program modules are not designed for inmates to be able to sleep. There are now partitions between the dayrooms and sleeping areas in all housing units, and these have alleviated noise levels in the sleeping areas. Higher noise levels in the recreational dayrooms are natural and do not appear to interfere unreasonably with inmates' competing leisure activities. There is no showing that fights "frequently erupt over noise." While noise and the stresses of enforced dormitory life may contribute to confrontations, together with the personality characteristics found in a correctional facility, inmate testimony most often described fights as stemming from disagreements over what television show to watch.

### 7) Recreation Space

Plaintiffs contend that the outdoor recreation yards require significant repair work and have been the cause of injuries, and that the recreation facilities are inadequate to meet the needs of 1700 inmates. Pl. Findings, at 11, 87. Opportunities for exercise must be afforded to prisoners. *See, e.g., Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir.1985) (citing cases).

FCF has nine major outdoor recreational and exercise yards with the following measurements:

| | |
|---|---|
| Building # 21A East yard— | 232' × 160' = 37,120 sq. ft. |
| Building # 21A West yard— | 232' × 160' = 37,120 sq. ft. |
| Building # 21 West yard— | 180' × 106' = 19,080 sq. ft. |
| Building # 21 East Keeplock yard (closed at present)— | 180' × 106' = 19,080 sq. ft. |

| | | |
|---|---|---|
| Visiting room yard— | 118' × 90' = | 10,620 sq. ft. |
| South Yard (Main Bldg.)— | 222' × 147' = | 32,634 sq. ft. |
| North Yard (Main Bldg.) | | |
| (closed in winter)— | 209' × 164' = | 34,276 sq. ft. |
| Main Bldg. Keeplock yard— | 125' × 79' = | 9,875 sq. ft. |
| Main Bldg. "New" yard (Ath. | | |
| field)— | 375' × 280' = | 105,000 sq. ft. |

Defendants' Exhibits D and E.

There was inmate testimony that the surfaces of Building 21A East and West yards need to be smoothly graded, but evidence of injuries from moving or playing on the uneven surface was sparse. James Hayden, education and recreation supervisor, testified that recreation instructors (who are not correctional officers) daily check the condition of the recreation yards and equipment. Plaintiffs have not established that the conditions of the recreation yards pose a significant threat to the safety and health of inmates.

The athletic field next to the Main Building is available for the several FCF sport teams who conduct intra- and extra-mural sporting events such as soccer, football and softball, and for team practices.

FCF has an indoor gymnasium building consisting of two floors which are attractive, well-equipped and obviously popular:

| | | |
|---|---|---|
| First Floor—gymnasium/auditorium— | 75' × 125' = | 9,375 sq. ft. |
| Lower level weight/exercise room— | 75' × 100' = | 7,500 sq. ft. |

As discussed above, dayrooms adjoining the housing units contain chairs, tables and cable color television. Inmates also play cards, checkers, and chess in the dayrooms. Mr. Stubbs testified that as recreation clerk, he delivered one or two decks of cards and ping pong balls to each housing unit each month.

Plaintiffs' expert Mr. Kamka testified that there was adequate recreation space at FCF. Its facilities do not remotely approach an unconstitutional deprivation of the inmates' rights to physical exercise. The inmates at FCF are required to spend relatively little time in their living units. The moderate disrepair of some of the recreational yards does not pose a threat to the safety or health of the inmates, who have ample facilities to satisfy their basic need for physical exercise, even when particular equipment is unavailable or certain recreational yards are closed.

## II. SANITATION

### 1) Control of Vermin and Insects

Plaintiffs contend that "[v]ermin are not adequately controlled throughout the facility. . . . [and] [r]oaches have been a problem in [FCF] mess halls." Pl. Findings, at 45.

Inmate testimony did establish incidents of foreign matter (e.g., chicken bone, rock in canned beans) being found in their food.

Vermin are adequately controlled in FCF. A private pest control firm is under contract with the facility and performs regular exterminations. All areas, including housing units, are sprayed at least once every four weeks. Housing units are fogged at least twice per year, or more frequently if necessary. Plaintiffs' expert, Mr. Kamka, testified that he found no evidence of infestations of insects or vermin during his tour of FCF. A January 1986 roach problem in the tray area in the Main Building dining room was brought to the administration's attention and taken care of with extra spraying.

Any roach problems in the housing units are exacerbated by FCF's policy of allowing inmates to do personal cooking on hot plates on tables in areas at the end of the housing units. Inmates purchase food items at the commissary, and are also permitted to take back bread from the dining hall to their housing unit. The policy gives inmates a measure of independence and control over an aspect of their daily life, which is a rarity in prison, and its allowance is humane although the cooking (originally intended to be only the warming of food) inevitably does attract vermin and create smells in the housing areas, especially in the evenings.

Nonetheless, on the whole roaches and vermin are adequately controlled throughout FCF.

### 2) Food Preparation

Plaintiffs challenge the sanitation in the food service and preparation areas. They claim that "[u]tensils in the mess hall are

frequently dirty [and] [s]anitation in the kitchen areas is inadequate." Pl. Findings, at 48.

Their charge that utensils in the dining areas are "frequently dirty" was not supported at trial. Inmate witness Happel testified that he had not seen dirty utensils in the dining area. Dirty trays or utensils reported to the staff were removed and replaced. Plaintiffs' expert Kamka testified that during his tour he saw no dirty trays in the kitchen or mess halls, and no remarkable buildup of dirt on trays or eating utensils.

The New York State Department of Health inspects FCF's food service facilities each year. Plaintiffs point to New York State Department of Health Food Service Establishment Inspection Reports, the latest of which was conducted on February 7, 1986, to support their charge of lack of sanitation in the kitchen. The February 7, 1986 report listed only two critical items—(1) soap stored with corn starch and (2) inmate smoking in the bakery while baking buns. Both were corrected immediately. The inspection report also listed items that need to be corrected by the next annual inspection. Many were corrected shortly after the inspection. The remaining ones do not establish plaintiffs' contentions that sanitation in the kitchen is inadequate.

FCF also takes monthly environmental cultures in the dining and kitchen areas. None of these cultures has shown any unsanitary or dangerous condition. It may be noted that plaintiffs presented evidence that the Federal Center for Disease Control recommends against performing food service cultures because of the frequent problem of false negatives; but that does not, even if given full effect, establish that conditions are unsanitary.

In its January 1986 review of FCF, the SCOC found that the kitchen and dining areas were "well lit and clean", a "variety of meals" were made available to the inmate population, and meals sampled on three different days were "warm and tasty". The SCOC made no mention of any complaints received concerning the food services. In its January 1984 review of FCF, the SCOC also found the kitchen and dining halls to be "clean and in good order".

From the above, and personal inspection, I find that sanitation in the FCF kitchen is adequate.

### 3) Lavatories and Showers

One inmate, Mr. Happel, testified that the bathrooms were not properly disinfected, and that the sinks and showers in HU 11–1 were filthy and grimy. Mr. Happel testified that he developed a fungus (which may have been athlete's foot) from using the showers. This was the only testimony of an instance of disease resulting from alleged unsanitary conditions. It falls far short of establishing a constitutional violation. My own inspection showed these areas to be generally clean and functional, although with some missing or inoperable fixtures. Mr. Happel also testified in this connection that the bathrooms were cleaned by inmates who live in the housing unit, that their work was completed in about twenty minutes out of the three hours or more allocated, and that cleansers (see below) and mops were available.

### 4) Clean Places for Eating, Sleeping and Working

Plaintiffs claim that "there is a lack of adequate cleaning supplies for housing units." Pl. Findings, at 47.

Approximately five hundred twenty four inmate porters are assigned during some part of the day to keep the eating, sleeping and working areas of FCF clean. Plaintiffs' expert Mr. Kamka testified that he felt that the facility was generally well run and well managed. He did not challenge the proposition that the facility had not been specially cleaned for his tour of FCF, because it is so huge and sprawling it would have been impossible to do a top-to-bottom clean up. He testified that what he found "dirty" about the facility were the inmates' personal clothes drying on racks in the bathrooms, and cleaning equipment strewn about in a secure confinement area.

Mr. Kamka also testified that there were adequate cleaning supplies for the housing units. There have been no significant shortages of cleaning supplies.

Inmate testimony indicated that adequate cleaning supplies were furnished, but the inmates thought that they should be given disinfectants. Superintendent Reid testified that he did not allow the use of disinfectants with a deodorizer in the correctional facility, because it tends to mask unsanitary conditions rather than eliminate them. FCF provides housing units with chlorinated scouring powder cleansers, soap and soap derivatives, all of which are cleansing agents and simultaneously kill bacteria. The decision is well within his province.

Based on my tour of FCF and the trial testimony, I find that FCF is adequately neat and clean.

## III. SAFETY

### 1) Protection from Violent, Deranged or Diseased Inmates

Plaintiffs contend that the "population expansion and the consequent overcrowding has caused a disproportionate increase in violence and other unusual incidents, rendering conditions of confinement dangerous" and that "[t]he high rate of violence manifests itself in constant physical fights and the frequent use of weapons. Violence is commonplace". Pl. Findings, at 53, 63. Defendants counter that the "expanded and converted FCF housing units have not created an unconstitutional risk of, or present fact of, undue violence." Def. Findings, at 27.

Plaintiffs rely primarily on the Unusual Incident Reports [7] ("UIRs") filed by the FCF administration. Plaintiffs contend that the increase in the number of UIRs at FCF reporting inmate-on-inmate assaults, inmate-on-staff assaults, inmate-on-inmate assaults with a weapon, housing area fires, suicides, suicide attempts and self-inflicted injuries was proportionately greater than the increase in the population since 1980, before the population expansion. A table proffered by plaintiffs, and not challenged by defendants, shows that while the FCF population grew approximately 43% between 1980 and 1985, inmate-on-inmate assaults increased by 111%; such assaults with weapons, 138%; inmate-on-staff assaults, 142%; housing area fires, 460%; suicides, suicide attempts and self-inflicted injuries, 850%.

These superficially shocking figures, however, dissipate upon examination. They measure only the number of reports, thus concentrating upon a symptom rather than a condition. Further, by taking the relatively low-population figure of 1980 as a base, the comparisons mask the year to year changes which reflect more accurately the realities of daily prison life: the distortion is magnified in the most recent years when the figures in significant categories (inmate assaults on other inmates, assaults with weapons, assaults on staff, and fires) are approximately the same—or actually reduced—despite a constantly rising population.

FCF has experienced a steady decline in the inmate-on-inmate assault incident rate per 1,000 inmates from a high of nine for the first quarter in 1984 to three for the third quarter in 1986. It also saw a steady decline in the inmate-on-inmate assault incident rate involving cutting and stabbing weapons, from a high of five and six during the first two quarters of 1984, to one for the third quarter in 1986. The number of inmate-on-inmate assaults involving weapons was thirty-one in both 1981 and 1985, although during that time the inmate population rose from approximately 1100 to over 1700. One might have expected an exponential increase in the number of such assaults because of sharp increases in population during 1981–82; yet it dropped by 20% during 1981–82, and by 25% in 1984–85. The inmate-on-staff assault rate peaked in 1983 and has since steadily de-

---

**7.** DOCS requires that state correctional facilities submit Unusual Incident Reports of accidents, inmate altercations, assault on staff or inmate, contraband, death of inmates, destruction of property, disruptive behavior, escape, escape attempt, fire, self-inflicted injury, refusal to follow instructions, sodomy, suicide, suicide attempt, theft and mass demonstration.

creased. These recent improvements are also reflected in SCOC reviews of FCF. In its January 1986 review SCOC stated that inmate-staff relations were generally satisfactory and no inmate-officer conflicts were observed; it noted that UIRs for 1984 and 1985, revealed a decrease of 27.7% in inmate assaults on staff and a decrease of 38.3% in inmate assaults on other inmates; it found that "the number of staff and inmate assaults, an average of 2.16 and 3.91 per month respectively, appeared to be relatively low"; and it found that the number of inmate disciplinary cases processed had decreased "significantly" from 1984 to 1985.

In its January 1984 review the SCOC found that there was a slight decline in the inmate assaults on staff in the latter part of 1983, while inmate assaults on inmates remained relatively consistent with an average of 2.27 assaults per month reported; it found the assault rates at FCF to be "on the low side" compared with other facilities.

The recent drops in these statistics may be partly explained by plaintiffs' expert Mr. Cox's testimony that there may be a disproportionate increase in violence during a period of growth in population, and that the violence drops when the population stabilizes at a higher level. With respect to the 1981 influx of inmates, Superintendent Reid also testified that "when you have an influx of new people into an area ... you have more conflict than you do with the same people you have dealt with over a period of time, the old pecking order.... So there is a period of time when you throw new people together when there is that likelihood of more friction than there is when you have a static population."

Mr. Kamka, a veteran prison administrator, testified that during his tour of FCF he sensed no tension either between inmates or between staff and administration, and that he saw no evidence of staff upon inmate brutality at FCF.

The number of reports of housing unit fires peaked at 28 in 1985, and dropped to 19 in 1986.

Since 1980, there has been one suicide (6/13/82) and one homicide (8/30/84). Plaintiff's expert Mr. Kamka conceded that one killing in five years is not an unusual rate of violence in a correctional facility ("... we're not running camps for boy scouts").

Plaintiffs failed to establish either a pervasive pattern of violence at FCF, or a failure by the administration to respond to violent behavior. Inmate testimony about violence and fighting showed that when a spontaneous fight broke out, correction officers usually responded immediately. There were times when a fight between inmates was "organized" and fellow inmates served as lookouts to thwart correction officer detection, and these undetected fights were not reported to correction officers. Correction officers or other inmates stopped the fight in the majority of occasions related by inmate witnesses.

On the whole, one could probably postulate—even without the dramatic rises in the number of UIRs at various times during the period—that an increase of over 40% in the inmate population would bring with it a disproportionate number of violent incidents of one sort or another. Inevitably an increased population, troubled by inadequate social skills and in competition for resources, will experience provocations and resolve them violently a disproportionate number of times as the number of unwanted social interactions multiply. All parties agree that it would be better if FCF's population were reduced to 1200.

However, that is not the point. The issue here is whether the present conditions of confinement at FCF constitute cruel and unusual punishment because of the levels of actual or threatened violence, and the answer is that they clearly do not.

a) The Tunnel

The tunnel connects the Main Building with Buildings 21 and 21A. Plaintiffs contend that its use "poses a dangerous risk to prisoners forced to use it. Defendants do not provide adequate security coverage in the tunnel." Pl. Findings, at 73.

The tunnel is used during bad weather, and for security reasons when civilian visitors are inside the prison grounds during special events or family days. From May to October, family days take place once a week.

When the tunnel is in use, three officers are stationed there at more or less fixed posts. Deputy Superintendent Piacente testified that he did not think that the officer located at the checkpoint in the middle of the tunnel (at the entrance to the auditorium) could see the officer located at the checkpoint at Building 21A, at the end of the tunnel.

Inmate Friedman testified that he saw one fight in the tunnel. A correction officer broke up the fight. Mr. Stubbs testified that he saw two fights in the tunnel, when no correction officers were present.

Obviously the tunnel is perceived as a place of potential danger, exacerbated by the correction officers' present apparent inability to keep all of it under surveillance. However, the number of actual incidents there was not established and the degree of real danger in the tunnel was left to hearsay and speculation. It seems that much of the risk could be eliminated by assigning another officer there during its periods of use.

### b) Theft

Plaintiffs contend that "[o]vercrowding at Fishkill has caused a drastic increase in the theft of prisoners' property. The high incidence of theft is due to many factors, including (1) the high traffic flow through housing units; (2) the inability to secure personal belongings in a cubicle which is open on one or two sides. The high incidence of theft causes additional violence and tension." Pl. Findings, at 75.

There was inmate testimony about petty thefts of clothing and commissary items in the housing units. Such thefts among inmates is probably an ineradicable part of life among prison inmates living together in open areas.

Inmate testimony revealed that correction officers are present when inmates travel through housing units on their way to other areas. Inmates at FCF can store their valuable personal articles in a locked footlocker. This leaves exposed, however, their other personal items (towels, pictures, clothing, etc.) displayed or shelved in their cubicles. When an inmate reports that property has been stolen, the institutional steward conducts an investigation, and the inmate can file a claim for reimbursement for stolen property.

Of course the problem remains, and it is related to the problems of violence. All that can be said upon this record is that they are not of constitutional dimensions.

### 2) Fire Protection and Emergency Evacuation

Plaintiffs contend that (1) fire safety measures are inadequate to prevent harm to inmates and staff; (2) procedures for alternative modes of egress in the event of a fire are faulty in some areas of the prison; (3) FCF's smoke detection and fire alarm system have been inadequate at least since April 1984; (4) although FCF has not had a major fire, housing unit fires frequently occur; (5) fire drills as conducted at FCF are neither designed nor adequate to ensure the safety of the inmate population in the event of a major fire; and (6) the prison's fire truck is old, unreliable and in need of replacement.

FCF is served primarily by the City of Beacon Fire Department (the city in which FCF is located) which provides the first line of fire defense. There are also back-up companies in nearby towns. FCF has not needed the assistance of any of these departments since Superintendent Reid came to FCF in 1977.

The FCF fire truck is not intended to be the facility's primary fire fighting device. Its purpose is to serve as an auxiliary pumper in case of fire emergency. It is conceded that the truck needs to be replaced.

There have been no major fires at FCF. The housing unit fires that have occurred have been promptly extinguished. There have been no instances of inmate injury,

beyond smoke inhalation, for which inmates have had to be treated.

All inmates are instructed concerning fire and emergency evacuation procedures by unit personnel when they arrive at their housing unit. Housing unit correction officers are instructed where the fire equipment is. Plaintiffs' expert Mr. Kamka testified that he observed during his tour that there were two fire exits for every housing unit, evacuation routes were posted, and there were sufficient fire extinguishers with up-to-date inspection tags.

Mr. Francis O'Connor, fire safety officer coordinator since March 1986, testified that fire extinguishers are checked every six months. He also testified that fire drills are held at least monthly. The area sergeant tells the inmates to leave the housing unit and await further instructions in the hallway. Mr. O'Connor testified that the drills test inmates' response time. Mr. Kamka testified that additionally fire drills on a quarterly basis should be unannounced during which the building is completely evacuated. Superintendent Reid testified that the FCF administrative staff "did not see the necessity to take the inmate all the way to the yard. The inmates know where the yard is, they have seen the evacuation route.... The purpose of that trial is to alert the inmates of the possibility there might be a fire, to see how quickly we can evacuate the unit, where we would expect the danger to be.... There might [also] be [security concerns]." Reid Tr. 60–61. I cannot criticize that administrative decision.

Mr. O'Connor conducted the 1986 annual health and safety inspection. The report issued shows meticulous maintenance follow-up in the area of fire and safety.

Deputy Superintendent for Administration Frank Nuite testified that most alarms in FCF ring locally, but some do not ring back in the central location point in the FCF administrative offices. In its Capital Budget requests, FCF has requested funds to repair operating deficiencies in the alarm system and to install more fire alarms, sprinklers and smoke detectors in several buildings.

Fire safety is a legitimate concern under the Eighth Amendment. *Santana v. Collazo*, 714 F.2d 1172, 1183 (1st Cir.1983), *cert. denied*, 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984). However, "not every deviation from ideally safe conditions constitutes a violation of the Constitution." *Ruiz v. Estelle*, 679 F.2d 1115, 1152–53, *modified on other grounds*, 688 F.2d 266 (5th Cir.1982), *cert. denied*, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). Here inmates are aware of emergency evacuation routes and these routes are unobstructed. There are working fire extinguishers and other basic fire fighting equipment in the housing units. The FCF fire safety and evacuation measures are adequate to protect the inmates' well-being and safety.

## IV. INMATE NEEDS AND SERVICES

### 1) Nutrition

Plaintiffs contend that FCF "has experienced persistent problems in keeping food warm" and that "[a]n insufficient amount of food is often delivered to the Main Building. When this occurs, the men must wait for additional supplies to be transported." Pl. Findings, at 84, 86.

Dining-related Eighth Amendment claims should be addressed to the quantity or quality of essential food. *Miles v. Bell*, 621 F.Supp. 51, 62 (D.Conn.1985). *Ramos v. Lamm*, 639 F.2d 559 (10th Cir.1980), sets forth the constitutional minimum for prison food:

> "[The state must provide] nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it."

*Id.* at 570–71.

There was inmate testimony that the food served in the Main Building was sometimes or often cold. The FCF kitchen is located in Building 21. Food is transported from Building 21 to the Main Building, where it is reheated and served. This is obviously a cumbersome process, but it works. Since June 1986, steamtables have

been used to keep the food at proper temperatures in the Main Building dining hall. On two inspections, one of which was on very short notice, the meals were hot, well prepared and more than adequate.

The January 1986 SCOC report also found that the kitchen and dining rooms were well lit and clean, and that meals were sufficient in quantity and quality. That Main Building inmates occasionally wait for additional food to be brought from the Building 21 kitchen is inconvenient, but it is not cruel and unusual punishment.

The food at FCF is institutional but it is good, well served under clean and relatively attractive conditions, nutritious and varied.

### 2) Visiting

Plaintiffs contend that the space in visiting areas is inadequate to serve the present prison population, which has allegedly resulted in limits on the number of visitors a prisoner may have at one time, long waiting periods, friction between prisoners and staff, and a lack of privacy during visits.

Visiting areas have been consolidated into the south end of Building 13 and the adjoining yard which is like a small park, with trees and grass, and used at the visitor's request. It is commonly open all summer and on family days. The main visiting room has a seating capacity of about 444; the secondary visiting room, 149; the non-contact visiting area, 41; the outside yard for visitors, approximately 150. These total 824. Plaintiffs' expert Kamka testified that with recent renovations there is now probably an adequate amount of visiting space.

In January 1986, the visiting schedule was as follows:

| | |
|---|---|
| Monday, Tuesday, Friday | 9:00 a.m. to 4:00 p.m. |
| Wednesday, Thursday | 1:00 p.m. to 8:45 p.m. |
| Weekends and Holidays | 9:00 a.m. to 4:00 p.m. |

Inmates at FCF have an unrestricted number of visits. Inmates can receive visitors on any day or on successive days, including Saturdays and Sundays, seven days a week. On weekends and holidays, inmates are limited to two visitors (except for children under 10) at any one time, but a variance from this requirement is available upon written request. Deputy Superintendent Riley testified that a request for one or two extra visitors is not usually denied. Visitors must sometimes wait for their visit on holidays, especially Christmas, Easter, Mother's Day and New Year's Day.

Superintendent Reid testified that he was aware of only three instances during his tenure when a visitor has been asked to terminate a visit early to accommodate others. Plaintiffs' expert Kamka testified that he found only one instance when a visit was terminated and that was because the inmate's visitor violated institutional rules by bringing non-approved medication into the visiting room. Mr. Kamka also found the noise levels in the visiting room to be acceptable at the times he was there.

FCF has constructed a Visitors' Center to provide shelter for visitors who are waiting for an inmate to appear in the visiting room. FCF also has a Family Visitation program in which eligible inmates may have extended trailer visits with up to six family members for up to two days. Approximately 450 inmates are currently participating in this program.

A program of visiting services, including professional family counseling, child care and education and recreation (Sesame Street Program), has been implemented to integrate the inmate population with their family and friends outside FCF.

For the reasons stated above, I find that there is adequate visiting space at FCF.

### 3) Educational and Rehabilitative Programming

Plaintiffs contend that the expanded population at Fishkill has (1) overtaxed prison programs; (2) resulted in the assignment of more prisoners than necessary to janitorial tasks, resulting in porters completing their entire program assignment in a very short period and being idle for the rest of the day; (3) caused long waiting lists for academic and other programs.

Limited work hours and delay before receiving education "do not inflict pain, much less unnecessary and wanton pain; deprivations of this kind simply are not punishments. We would have to wrench the Eighth Amendment from its language and history to hold that delay of these desirable aids to rehabilitation violates the Constitution." *Rhodes v. Chapman*, 452 U.S. at 348, 101 S.Ct. at 2400. Nevertheless, the educational, vocational and work programs may have an impact on the levels of tension and the totality of conditions at FCF.

In its January 1986 review, the SCOC found that 1284 out of a population of 1700 were programmed in academic, vocational and industry "modules" (see below). It also found that only nineteen inmates who had been at FCF for less than two weeks were unassigned to a program. The addition of a computerized assignment placement system allows the FCF Program Committee to make program assignments and fill program vacancies more expeditiously.

An inmate's day at FCF is divided into three program "modules." The morning module lasts approximately three hours (8:15—11:20 a.m.); the afternoon module, two and two-thirds hours (1:00—3:40 p.m.); the evening module, two and one-half hours (6:00—8:30 p.m.). Each inmate is scheduled for work, educational or vocational activities for two modules each day. The third module is for recreation, during which inmates may use the various outdoor yards, indoor recreation areas, or participate in activities of inmate groups such as Jaycees, N.A.A.C.P., etc. Occasionally an inmate is allowed to work during all three modules. It takes two to three weeks after he enters FCF for an inmate to receive his program assignments. An inmate first meets a counselor, to determine a program plan based on his needs, skills and interests. He then meets the FCF program committee, which reviews his plan and assigns him an appropriate program.

During this interim period, an inmate is assigned to the general "porter pool" which is responsible for cleaning the general areas of the facility, such as hallways, stairwells and any other area that may need cleaning. Thereafter, he would not usually be assigned to a housing unit porter position for more than one work module a day, unless he specifically refuses other work, education, or vocational assignments or they are unavailable. Interestingly, the evidence is that inmates are usually not compelled to accept a general porter's job. They usually request it.

The following table lists the number of inmates enrolled in vocational (night and day) and academic programs, along with the number of openings or vacancies in the programs, as of September 19, 1986:

| | No. of Students Enrolled | No. of Openings or Vacancies |
| --- | --- | --- |
| Vocational (night & day) | 437 | 129 |
| Academic | 343 | 78 |
| Self-Study (Outreach, Literacy Volunteers of America, etc.) | 208 | |
| College (a 2-module program) | 243 | |
| Special Subjects (Art, Music Hobby Shop) | 58 | |
| Total | 1,289 | |

There are no waiting lists, and, indeed, there are vacancies or openings in the vocational and academic programs. There are fifteen vocational workshops, ranging from radio and television repair and plumbing to barbering and drafting. Only one inmate testified about a waiting list (which he circumvented) for a computer course.

In January 1986, 105 inmates were enrolled in the Industry Programs. Industrial shops consist of the following: (1) security screen; (2) metal bed fabrication; (3)

wood shop; (4) carton shop; (5) metal bed shop; (6) furniture fabrication; and (7) furniture assembly. At that time, there were no waiting lists for the industry programs.

As of September 25, 1986 there were 524 housing unit porters. The FCF administration's projected goal for the number of housing porters is 430. There are also inmates working as food service workers and in maintenance crews.

The third program module is designed to allow inmates to participate in passive recreation (e.g., watching TV, playing cards, chess or checkers), inmate organizations, volunteer service programs, religious activities, sports and exercise activity. Religious service and adjunct religious programs, the Youth Assistance Program ("Scared Straight"), Alcoholics Anonymous, Gamblers Anonymous, Organization of Latin Americans, Veterans Project, N.A.A.C.P., Jaycees, Road Runners, softball league, power lifting and bridge clubs, handicrafts, volleyball, personal fitness class, badminton, old timers exercise and sporting events, musical bands, the Network Program and the Behavior Intervention Program serve as rehabilitative opportunities, as well as vehicles for reducing idleness and tension.

The testimony of those inmate witnesses who were questioned about their job and education assignments confirmed that they all had salaried program assignments at least two of three program modules each day. Mr. McGourty testified that he worked as senior administrative law clerk in FCF for two modules a day and also taught during the third module two nights a week. Mr. Hodges testified that he had been enrolled in the college program, commercial education and hobby shop programs while at FCF. Mr. West testified that he was enrolled in vocational (television repairs) and educational programs. Mr. Nillson testified that he was enrolled in the college program and was a participant in the Youth Assistance Program. Mr. Happel worked as an inmate grievance clerk and was enrolled in a computer class. Mr. Stubbs had worked as a kitchen worker before he became disabled, after which he was the recreation clerk. Mr. Gaffney took a welding class and worked as a housing unit porter.

For the reasons stated above, I find that the educational, vocational and rehabilitative programs at FCF are not "overtaxed," there is a wide variety of such programs, and they serve as a vehicle for the reduction of idleness and tension levels at FCF.

## V. STAFFING

Trained and Adequate Guards and Other Staff

Plaintiffs' expert Mr. Kamka testified that FCF is a generally well run and well managed correctional facility. I found Superintendent Reid to be a candid, humane and well-informed witness and administrator. I credit his testimony and to the extent that management of a prison prevents the quality of life there from being harsh, I find that FCF is managed intelligently and humanely by Superintendent Reid and his staff.

FCF has about 720 correctional officers and 61 sergeants, lieutenants and captains on its security staff. The correction officer ratio at FCF is 2.37 inmates to one correction officer, the third lowest (out of 23) in New York for medium security correctional facilities.

Mr. Kamka testified that there is adequate security staff at FCF, the security staffing level is exceptional, and FCF does a good job reporting unusual incidents. In its January 1986 review of FCF, SCOC reported that no security problems were brought to its attention. In its January 1984 review of FCF, SCOC also reported that the staff availability throughout the housing areas and various security posts appeared adequate.

As of October 16, 1987 about one-third of the assigned security staff were probationary officers (less than one year of experience). There are, however, a large number of more experienced supervisory and correctional officer staff who provide adequate supervision over the newer employees.

With the expansion of the inmate population since 1981, there has been a concomitant expansion of the number of correction officers and supervisory staff.

FCF employs patrolling correction officers as well as fixed post supervision in the housing units, and the separate dayrooms in the Main Building. Correction officers are present in the housing units 24 hours a day.

Ronald Edwards, an FCF correction officer and president of the local correction officers union, testified that during the past two years he has not received complaints from correction officers about unsafe working conditions or requests for transfer because of fear. Many correction officers request transfers so that they may be nearer to their homes. Mr. Edwards also testified that the alleged staffing shortage about which he testified in *Mitchell v. Cuomo*, 84 Civ. 1421 (E.D.N.Y. Oct. 1, 1984), has been remedied.

For the reasons stated above, I find that FCF provides adequate security staffing.

## VI. OTHER ISSUES

### 1) Mail

Plaintiffs charge that "[d]elays in mail service exist because of the high demand on these services. Incoming and outgoing mail, including legal mail, is frequently delayed." Pl. Findings, at 86, and some inmates testified that they experienced delays in receiving incoming mail of up to three to eleven days.

From all the credible evidence on the point I find that mail delays are no more than infrequent episodes, that prompt attention is paid to complaints of late or missing mail, and that no situation of constitutional dimension is presented in this regard.

## Conclusion

■ Taken separately or in the combinations in which they are experienced in daily life, the conditions of confinement at Fishkill Correctional Facility do not approach a violation of the Eighth Amendment. These inmates are not deprived of a civilized measure of life's necessities, *Rhodes v. Chapman*, 452 U.S. at 347, 101 S.Ct. at 2399, or of human dignity, food, clothing, shelter, sanitation or personal safety. *Lareau v. Manson*, 651 F.2d 96, 106 (2d Cir.1981). Beyond the occasional exceptions inherent in any institution housing an all-male criminal population, they are not exposed to hardship, privation or danger. Indeed, in fairness one should state that the credible evidence as a whole establishes that the prison's conditions are well above the constitutional minima, and its administration is responsive, skilful and humane. Under the circumstances the current level of inmate population, by no means ideal, is acceptable and presents no occasion for this Court's intervention.

## Attorneys' Fees

■ Plaintiffs move pursuant to Fed.R. Civ.P. 37(d) and the inherent authority of the court for costs and attorneys' fees incurred in connection with the defendants' failure timely to provide all UIR reports for the period 1980–85 in response to plaintiffs' discovery request. The controlling facts are that (1) at a hearing on October 28, 1985 this Court ruled that defendants were required to produce "... all documents as requested back to 1980. These include U.I.R.'s...." [See Bromley letter to La Pook dated October 29, 1985], but (2) in some undetermined fashion, for which defendants' trial counsel is in no way responsible, some staff attorney at the Department of Correctional Services misconstrued the direction as involving only those UIRs reporting inmate violence or inmate-implicated incidents, and thus (3) defendants failed to produce over a thousand UIRs until trial counsel discovered the omission on the next to last day of the trial, and promptly and responsibly set about rectifying the situation, which nonetheless (4) required a delay in the completion of the trial, extra work by plaintiffs' lawyers and experts, and further travel by plaintiffs'

experts to attend and complete their testimony in the light of the newly-produced mass of reports. Defendants contend the extra work was unnecessary, but I do not agree. In simple prudence the previously-unproduced reports had to be reviewed, whatever their ultimate effect on the proof, and in fact they required changes in some of plaintiffs' statistical evidence about which their experts testified. Defendants have offered no objection to the calculation of the plaintiffs' experts' fees and expenses thus incurred at a total of $3,963.58 together with $250 spent for shipping the newly-produced UIR's to their offices and this amount is awarded to plaintiffs pursuant to Fed.R.Civ.P. 37(b), since its burden should be borne by the party responsible for the error. Since plaintiffs have not established or suggested any basis for evaluating the extra hours expended by their attorneys, I make no award of attorneys' fees. Indeed, although in other contexts the fact that plaintiffs paid their attorneys nothing is irrelevant, *see Blum v. Stenson*, 465 U.S. 886, 894–95, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984), here an award of attorneys' fees would not in fact reimburse plaintiffs for an expenditure (for they made none) but only serve to penalize defendants for their mistake. Since there is no evidence their mistake was wilful or in bad faith, I decline to impose that penalty.

The Clerk is directed to enter judgment dismissing the complaint, with costs and disbursements (a) in favor of plaintiffs in the amount of $4,213.58 and (b) in favor of defendants as allowed by law.